IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JESSICA GESSELE, ASHLEY           3:14-CV-1092-BR
ORTIZ, NICOLE GESSELE, TRICIA
TETRAULT, CHRISTINA MAULDIN,     OPINION AND ORDER
and JASON DIAZ on behalf of
themselves and all others
similarly situated,

       Plaintiffs,

v.

JACK IN THE BOX, INC., a
Corporation of Delaware,

       Defendant.


JON M. EGAN
240 Sixth Street
Lake Oswego, OR 97034-2931
(503) 697-3427

       Attorney for Plaintiffs

DOUGLAS S. PARKER
JENNIFER NETH WARBERG
DON STAIT
Littler Mendelson, P.C.
121 S.W. Morrison Street
Suite 900
Portland, OR 97204
(503) 221-0309

       Attorneys for Defendant


1 - OPINION AND ORDER

**BROWN, Judge.**

This matter comes before the Court on Defendant Jack in the Box, Inc.'s Motion (#95) for Partial Summary Judgment.  For the reasons that follow, the Court **GRANTS in part** and **DENIES in part** Defendant's Motion.


## BACKGROUND

Plaintiffs were employed by Defendant Jack in the Box, Inc., in its Oregon restaurants at various times.  Plaintiffs received their final paychecks from Defendant on the following dates:

| | |
|---|---|
| Tricia Tetrault: | July 11, 2008 |
| Ashley Ortiz: | December 26, 2008 |
| Nicole Gessele: | March 20, 2009 |
| Jessica Gessele: | November 23, 2009 |
| Christina Mauldin: | March 30, 2010 |
| Jason Diaz: | March 30, 2010 |

On March 29, 2010, Jack in the Box "franchised" several corporate-owned Jack in the Box restaurants (including the restaurant at which Mauldin and Diaz were employed) to franchisee Northwest Group, Inc. (NWG).

On August 13, 2010, Jessica Gessele, Ashley Ortiz, Nicole Gessele, and Tricia Tetrault, on behalf of all those similarly situated, filed a putative class-action Complaint (*Gessele I*)[1] in this Court against Jack in the Box for violation of the minimum-wage and overtime provisions of the Fair Labor Standards Act

---

[1] In *Gessele I* Ashley Ortiz proceeded as Ashley Gessele and Christina Mauldin proceeded as Christina Luchau.

(FLSA), 29 U.S.C. § 201, *et seq*., and various Oregon wage-and-hour laws.  *Gessele I* was assigned to Magistrate Judge Janice M. Stewart.

On January 4, 2011, Jason Diaz filed a Complaint in this Court against Jack in the Box and three of its franchisees:  NWG; PSNW Enterprises, LLC; and VR, Inc. (*Diaz I*) in which he alleged claims for violation of the minimum-wage and overtime provisions of the FLSA and Oregon wage-and-hour statutes, unpaid wages on termination in violation of Oregon statutes, wrongful deductions in violation of Oregon Revised Statute § 652.610, wrongful method of payment in violation of Oregon Revised Statute § 652.110, and use of an unregistered business name in violation of Oregon Revised Statute § 648.007.  *Diaz I* was assigned to Senior District Judge Robert E. Jones.

On May 5, 2011, Judge Jones issued an opinion and order in *Diaz I* in which he granted the franchise defendants' motion to compel arbitration of Diaz's claims on the ground that Diaz's claims against those defendants were encompassed by an arbitration agreement that Diaz entered into on March 29, 2010, when his employment transferred to franchisee NWG.

On May 16, 2011, Jessica Gessele, Ashley Ortiz, Nicole Gessele, and Tricia Tetrault filed a First Amended Complaint in *Gessele I* in which they added Christina Mauldin as a named Plaintiff.

3 - OPINION AND ORDER

On May 30, 2011, Diaz filed an Amended Complaint in *Diaz I* in which he alleged claims only against Jack in the Box for violation of the minimum-wage and overtime provisions of the FLSA and Oregon wage-and-hour statutes, unpaid wages on termination in violation of Oregon statutes, wrongful deductions in violation of Oregon Revised Statute § 652.610, and wrongful method of payment in violation of Oregon Revised Statute § 652.110.

On July 6, 2011, Diaz filed in *Diaz I* an unopposed Motion to Dismiss his claims without prejudice.  On July 8, 2011, Judge Jones entered an Order granting the Motion to Dismiss and a Judgment dismissing *Diaz I* without prejudice.

On March 20, 2012, Jessica Gessele, Ashley Ortiz, Nicole Gessele, Tricia Tetrault, and Christina Mauldin filed a Second Amended Complaint in *Gessele I* in which they alleged Defendant (1) failed to pay minimum wages in violation of the FLSA, (2) failed to pay overtime wages in violation of the FLSA, (3) failed to pay minimum wages in violation of Oregon Revised Statute § 653.025, (4) failed to pay overtime wages in violation of Oregon Revised Statute § 653.261, (5) failed to pay all wages due after termination of Plaintiffs' employment in violation of Oregon Revised Statute § 652.140, (6) deducted unauthorized amounts from Plaintiffs' paychecks in violation of Oregon Revised Statute § 652.610, and (7) failed to pay all wages when due as required by Oregon Revised Statute § 652.120.

On December 13, 2012, Jessica Gessele, Ashley Ortiz, Nicole Gessele, Tricia Tetrault, and Christina Mauldin filed a Motion for Leave to File Third Amended Complaint in *Gessele I*. On January 7, 2013, Magistrate Judge Stewart denied the Motion on the grounds of undue delay and prejudice.

On June 26, 2013, *Gessele I* was reassigned to this Court.

On November 5, 2013, Jason Diaz filed a Consent to Join Law Suit in *Gessele I*. Diaz, however, did not become a named Plaintiff in *Gessele I*.

On March 19, 2014, this Court issued an Opinion and Order in *Gessele I* in which it granted Defendant's Motion for Summary Judgment on the ground that Jessica Gessele, Ashley Ortiz, Nicole Gessele, Tricia Tetrault, and Christina Mauldin were required to file written consents with the Court to commence their FLSA collective action, but they failed to file those written consent forms timely.[2] The Court, therefore, concluded it never acquired jurisdiction over the FLSA claims of Jessica Gessele, Ashley Ortiz, Nicole Gessele, Tricia Tetrault, and Christina Mauldin, and, as a result, the Court could not exercise supplemental jurisdiction over their state-law claims. The Court also concluded Jessica Gessele, Ashley Ortiz, Nicole Gessele, Tricia Tetrault, and Christina Mauldin did not file written consents

_____

[2] Jessica Gessele, Ashley Ortiz, Nicole Gessele, Tricia Tetrault, and Christina Mauldin did not file purported FLSA consent forms until September 27, 2013.

within the applicable limitations period; neither equitable tolling nor equitable estoppel applied; and, therefore, their FLSA claims were barred by the applicable statute of limitations. The Court dismissed the FLSA claims of Jessica Gessele, Ashley Ortiz, Nicole Gessele, Tricia Tetrault, and Christina Mauldin with prejudice and dismissed their state-law claims without prejudice.

On April 16, 2014, Jessica Gessele, Ashley Ortiz, Nicole Gessele, Tricia Tetrault, and Christina Mauldin filed in *Gessele I* an unopposed Motion to Amend/Correct in which they moved the Court to amend its March 19, 2014, Opinion and Order to dismiss their FLSA claims without prejudice on the ground that the Court lacked jurisdiction over those claims.

On May 15, 2014, the Court granted the Motion to Amend/Correct in *Gessele I* and issued an Amended Opinion and Order in which it granted Defendant's Motion for Summary Judgment on the ground that Jessica Gessele, Ashley Ortiz, Nicole Gessele, Tricia Tetrault, and Christina Mauldin failed to timely file written consent forms as required by the FLSA. The Court, therefore, never acquired jurisdiction over Jessica Gessele, Ashley Ortiz, Nicole Gessele, Tricia Tetrault, and Christina Mauldin's FLSA claims, and, as a result, the Court could not exercise supplemental jurisdiction over their state-law claims. Accordingly, on May 15, 2014, the Court entered a Judgment

dismissing the entire matter without prejudice.

On June 10, 2014, Jessica Gessele, Ashley Ortiz, Nicole Gessele, Tricia Tetrault, Christina Mauldin, and Jason Diaz filed a putative class action against Jack in the Box in Multnomah County Circuit Court (*Gessele II*) in which they alleged claims for violation of Oregon's wage-and-hour laws, violation of the FLSA, breach of fiduciary duty, and equitable and quasi-contractual claims for return of money.

On July 9, 2014, Defendant removed *Gessele II* to this Court on the grounds of federal-question jurisdiction based on Plaintiffs' FLSA claims and/or jurisdiction under the Class Action Fairness Act (CAFA), 28 U.S.C. § 1332(d)(2).

On August 8, 2014, Plaintiffs filed a Motion to Remand Case to State Court on the grounds that (1) issue preclusion/collateral estoppel barred litigation of *Gessele II* in this Court; (2) if issue preclusion did not bar litigation, the "law of the case" barred litigation in this Court; and (3) judicial estoppel barred litigation of *Gessele II* in this Court even if neither issue preclusion nor law of the case barred such litigation.

On October 17, 2014, the Court entered an Opinion and Order in *Gessele II* in which it granted in part and denied in part Plaintiffs' Motion to Remand.  The Court concluded (1) although issue preclusion barred relitigation as to whether the Court had

jurisdiction to hear the FLSA claims of Jessica Gessele, Ashley
Ortiz, Nicole Gessele, Tricia Tetrault, and Christina Mauldin, it
did not bar litigation of Diaz's FLSA claims against Defendant
brought for the first time in *Gessele II*; (2) relitigation of
this Court's jurisdiction was not barred by the law of the case;
(3) because Diaz was never a named Plaintiff in *Gessele I*, the
Court's decision regarding its jurisdiction over that matter did
not apply to Diaz, and, therefore, judicial estoppel did not
apply nor require remand of Diaz's FLSA claims; (4) judicial
estoppel applied to and estopped Defendant from relitigating the
issue of this Court's lack of jurisdiction over the FLSA claims
of Jessica Gessele, Ashley Ortiz, Nicole Gessele, Tricia
Tetrault, and Christina Mauldin; and (5) Defendant did not waive
its right to remove *Gessele II* by pursuing dismissal in *Gessele I*
on jurisdictional grounds.

On October 29, 2014, Defendant moved for a stay of *Gessele
II* pending the outcome of Defendant's appeal of the Court's
October 17, 2014, Opinion and Order, which Defendant intended to
file in the Ninth Circuit.

On November 6, 2014, the Court granted Defendant's Motion
for Stay.

On June 11, 2015, the Ninth Circuit issued a Mandate in
which it reversed in part and remanded the matter to this Court
for further proceedings.  Specifically, the Ninth Circuit held

8 - OPINION AND ORDER

(1) Defendant is precluded from relitigating "the jurisdictional issues" in *Gessele I* by the doctrine of issue preclusion; (2) because *Gessele I* did not address the timeliness of the new FLSA claims asserted in *Gessele II* nor jurisdiction under CAFA, Defendant "is not precluded from invoking federal jurisdiction" in *Gessele II*; (3) Defendant's position in *Gessele I* that the Court lacked jurisdiction over the FLSA claims asserted in that matter "is not inconsistent with [Defendant's] . . . [assertion in *Gessele II* that] there is no time bar to the newly asserted FLSA claims, or that the district court has CAFA jurisdiction over the state-law claims"; and (4) Defendant did not waive its right to remove *Gessele II* "through its filings in the state court or its prior conduct in this litigation."

On August 31, 2015, Defendant filed in *Gessele II* a Motion for Partial Summary Judgment; Plaintiffs filed a Motion for Partial Summary Judgment (Statute of Limitations) and to Establish Tolling for FLSA Collective Members; and Plaintiffs filed a Motion for Partial Summary Judgment on Jack in the Box's 8th (Private Right Of Action), 9th (Due Process) and 12th (Preemption) Affirmative Defenses. The Court took the Motions under advisement on October 5, 2015.

On December 22, 2015, the Court issued an Order in which it denied as premature (1) those portions of Defendant's Motion for Partial Summary Judgment and Plaintiffs' Motion for Partial

9 - OPINION AND ORDER

Summary Judgment (Statute of Limitations) relating to whether the California putative class members are subject to binding settlements in two California state cases; (2) those portions of Defendant's Motion for Partial Summary Judgment and Plaintiffs' Motion for Partial Summary Judgment (Statute of Limitations) relating to Defendant's status as a joint employer; and (3) Plaintiffs' Motion for Partial Summary Judgment on Jack in the Box's 8th (Private Right Of Action), 9th (Due Process) and 12th (Preemption) Affirmative Defenses as to Defendant's Ninth Affirmative Defense.  The Court granted the parties leave to renew those Motions after limited discovery and after the Court issued its Opinion and Order on the remaining portions of the pending Motions.

On February 16, 2016, the Court heard oral argument on those portions of the pending Motions for Partial Summary Judgment that it did not address in its December 22, 2015, Opinion and Order.

On March 10, 2016, the Court issued an Opinion and Order in which it granted Defendant's Motion for Partial Summary Judgment; denied Plaintiffs' Motion for Partial Summary Judgment (Statute of Limitations) and to Establish Tolling; and granted in part and denied in part Plaintiff's Motion for Partial Summary Judgment on Jack in the Box's 8th (Private Right Of Action), 9th (Due Process) and 12th (Preemption) Affirmative Defenses.  Specifically, the Court (1) granted Plaintiffs' Motion for Partial Summary Judgment

as to Defendant's Eighth Affirmative Defense and dismissed that
Defense with prejudice; (2) granted Plaintiffs' Motion for
Partial Summary Judgment as to Defendant's Twelfth Affirmative
Defense as to those portions of Plaintiffs' Seventh and Eighth
Claims that are preempted by the FLSA or Oregon's wage-and-hour
laws as set out in the March 10, 2016, Opinion and Order; and
(3) denied in part Plaintiffs' Motion for Partial Summary
Judgment as to Defendant's Twelfth Affirmative Defense as to
those portions of Plaintiff's Seventh and Eighth Claims that are
not preempted by the FLSA or Oregon's wage-and-hour laws as set
out in the March 10, 2016, Opinion and Order.  In summary, the
Court's rulings had the following effect:

> (1) This matter would go forward as to named Plaintiffs'
> state wage-and-hour claims; Jason Diaz's FLSA claims;
> and named Plaintiffs' FLSA claims from March 29, 2010,
> to the present.

> (2) There were not any motions pending for certification of
> a class or collective action or any motions pending as
> to Defendant's status as a joint employer, as to the
> effect of the California settlement, or as to whether
> Diaz's FLSA claims are subject to mandatory
> arbitration.

On March 24, 2016, the parties filed a Joint Statement in
which they agreed the following claims remain in this matter:

11 - OPINION AND ORDER

(1) Plaintiffs' state wage-and-hour claims; (2) Plaintiffs' Seventh and Eighth Claims to the extent that they do not overlap with state or federal statutory claims; (3) Diaz's FLSA claims; and (4) Plaintiffs' FLSA claims from March 29, 2010, to the present.

On July 7, 2016, the Court issued an Order in which it granted Defendant leave to file dispositive motions as to:

(1) All FLSA claims from March 29, 2010, to the present on the ground that Defendant is not a joint employer of franchisee employees;

(2) All FLSA claims asserted by Jason Diaz on the ground that Diaz failed to file a written consent under the FLSA;

(3) All of Diaz's state and federal claims on the grounds that (a) he is required to arbitrate those claims and (b) Diaz failed to pursue his claims in arbitration after his individual lawsuit (3:11-cv-0006-JO) was dismissed; and

(4) All FLSA claims of any California putative class members subject to the class settlements in the *Frederick* and *Olvera* cases.

On September 1, 2016, Defendant filed a Motion for Partial Summary Judgment permitted by the Court in its July 7, 2016, Order.  The Court took Defendant's Motion under advisement on

12 - OPINION AND ORDER

October 12, 2016.


## **STANDARDS**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Washington Mut. Ins. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011). *See also* Fed. R. Civ. P. 56(a).  The moving party must show the absence of a dispute as to a material fact. *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005).  In response to a properly supported motion for summary judgment, the nonmoving party must go beyond the pleadings and show there is a genuine dispute as to a material fact for trial. *Id.*  "This burden is not a light one . . . .  The non-moving party must do more than show there is some 'metaphysical doubt' as to the material facts at issue." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citation omitted).

A dispute as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  The court must draw all reasonable inferences in favor of the nonmoving party. *Sluimer v. Verity, Inc.*, 606 F.3d 584, 587 (9th Cir. 2010).  "Summary

13 - OPINION AND ORDER

judgment cannot be granted where contrary inferences may be drawn from the evidence as to material issues." *Easter v. Am. W. Fin.*, 381 F.3d 948, 957 (9th Cir. 2004)(citation omitted).  A "mere disagreement or bald assertion" that a genuine dispute as to a material fact exists "will not preclude the grant of summary judgment." *Deering v. Lassen Cmty. Coll. Dist.,* No. 2:07-CV-1521-JAM-DAD, 2011 WL 202797, at *2 (E.D. Cal., Jan. 20, 2011) (citing *Harper v. Wallingford*, 877 F.2d 728, 731 (9th Cir. 1989)).  When the nonmoving party's claims are factually implausible, that party must "come forward with more persuasive evidence than otherwise would be necessary." *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1137 (9th Cir. 2009)(citation omitted).

The substantive law governing a claim or a defense determines whether a fact is material. *Miller v. Glenn Miller Prod., Inc.*, 454 F.3d 975, 987 (9th Cir. 2006).  If the resolution of a factual dispute would not affect the outcome of the claim, the court may grant summary judgment. *Id*.


<u>**DISCUSSION**</u>

Defendant moves for partial summary judgment as to (1) all of Plaintiffs' FLSA claims from March 29, 2010, to the present on the ground that Defendant was not Plaintiffs' joint employer during that period; (2) all of Plaintiff Jason Diaz's state and federal claims on the ground that he is required to arbitrate

those claims; (3) in the alternative, Diaz's FLSA claims on the ground that Diaz failed to file a timely written consent as required by the FLSA; and (4) all FLSA claims of any California putative collective-action members because they are subject to the settlements in the cases of *Frederick v. Jack-In-The-Box, Inc.,* No. RIC50144, and *Olvera v. Jack In The Box, Inc.,* No. 37-2013-00072707.

Plaintiffs, in turn, assert Defendant was Plaintiffs' joint employer after March 29, 2010; Diaz is not required to arbitrate his state or federal claims; Diaz filed a timely written consent as required by the FLSA; and the FLSA claims of any California putative collective-action members are not subject to the settlements in the *Frederick* and *Olvera* cases.

## I. Defendant was not Plaintiffs' joint employer on or after March 29, 2010.

As noted, Defendant moves for summary judgment as to all of Plaintiffs' FLSA claims from March 29, 2010, to the present on the ground that Defendant was not Plaintiffs' joint employer on or after March 29, 2010, at which time Defendant "franchised" several corporate-owned Jack in the Box restaurants (including the restaurant at which Jessica Gessele, Mauldin, and Diaz were employed) to franchisee Northwest Group, Inc. (NWG).[3]

---

[3] Defendant asserts and Plaintiffs do not dispute "[n]o named plaintiff has worked at a restaurant operated by any . . . franchisee" other than NWG.

15 - OPINION AND ORDER

Plaintiffs assert the FLSA defines the employment relationship in expansive terms that should lead the Court to conclude Defendant was Plaintiffs' employer during the relevant period.

**A.    Joint-Employer Test**

The FLSA defines an "employer" to include "any person acting directly or indirectly in the interest of an employer in relation to an employee and includes a public agency." 29 U.S.C. § 203(d). The Ninth Circuit has held "two or more employers may jointly employ someone for purposes of the FLSA." *Bonnette v. Cal. Health and Welfare Agency*, 704 F.2d 1465, 1469 (9th Cir. 1983). *See also E.E.O.C. v. Pac. Mar. Ass'n*, 351 F.3d 1270, 1275 (9th Cir. 2003)(same). All joint employers are individually liable for FLSA violations. 29 C.F.R. § 791.2(a).

"Whether an entity is a 'joint employer' under the FLSA is a question of law." *Torres-Lopez v. May*, 111 F.3d 633, 638 (9th Cir. 1997)(citing *Bonnette*, 704 F.2d at 1469).

"[B]efore a person or entity can be a joint employer, it must possess the attributes of an employer to some degree." *Courtland v. GCEP-Surprise, LLC*, No. CV-12-00349-PHX-GMS, 2013 WL 3894981, at *2 (D. Ariz. July 29, 2013)(quotation omitted). The Ninth Circuit applies an "economic reality" test to determine the existence of a joint employment relationship. *Courtland*, 2013 WL 3894981, at *2 (citing *Torres-Lopez*, 111 F.3d at 639). The Ninth

16 - OPINION AND ORDER

Circuit has made clear that the Court must consider "[a]ll factors relevant to the particular situation" (*Moreau v. Air Fr.*, 356 F.3d 942, 947 (9th Cir. 2004)), and base its ultimate determination on "the circumstances of the whole activity." *Bonnette*, 704 F.2d at 1470.

In *Bonnette* the Ninth Circuit held the test focuses primarily on four factors: "whether the alleged employer (1) had the power to hire and fire the employees; (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records." 704 F.2d at 1470. Later in *Torres-Lopez* the Ninth Circuit identified five "regulatory factors" similar to those set out in *Bonnette* that courts should consider:

> (A) The nature and degree of control of the workers;
>
> (B) The degree of supervision, direct or indirect, of the work;
>
> (C) The power to determine the pay rates or the methods of payment of the workers;
>
> (D) The right, directly or indirectly, to hire, fire, or modify the employment conditions of the workers; [and]
>
> (E) Preparation of payroll and payment of wages.

111 F.3d at 646 (citing 29 C.F.R. § 500.20(h)(4)(ii)). The Ninth Circuit also identified a number of "nonregulatory" factors for courts to consider when they are applicable:

> (1) The degree of the alleged employer's right to

17 - OPINION AND ORDER

control the manner in which the work is to be
performed;

(2) The alleged employee's opportunity for profit
or loss depending upon the alleged employee's
managerial skill;

(3) The alleged employee's investment in equipment
or materials required for the alleged employee's
task, or the employee's employment of helpers;

(4) Whether the service rendered requires a
special skill;

(5) The degree of permanence of the working
relationship;

(6) Whether the service rendered is an integral
part of the alleged employer's business;

(7) Ownership of property or facilities where work
occurred; and

(8) Whether responsibility under the contracts
between a labor contractor and an employer passes
from one labor contractor to another without
material changes.

*Id.* (citations omitted).  Courts have made clear that not all of
the nonregulatory factors set out in *Torres-Lopez* are applicable
to the joint-employer analysis in every case, and courts need
consider only those factors that are relevant.  *See, e.g., Zhao
v. Bebe Stores, Inc.*, 247 F. Supp. 2d 1154, 1159-60 (C.D. Cal.
2003)(considering only those *Torres-Lopez* nonregulatory factors
relevant to the case).

**B.   Parties' Positions as to the *Bonnette* Factors**

As noted, under *Bonnette* the Court should consider
whether Defendant (1) had the power to hire and to fire the

18 - OPINION AND ORDER

employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, or (4) maintained employment records.

**1.    Power to Hire and to Fire Franchise Employees**

Defendant asserts it does not have the power to hire or to fire franchise employees pursuant to the terms of the Franchise Agreement it entered into with NWG and under Defendant's actual business practices.  The Franchise Agreement specifically provides:

> Franchisee is an independent contractor and shall not be deemed an agent partner joint venture or employee of [Defendant]; and no fiduciary relationship between the parties exists. Franchisee shall have no right to bind or obligate [Defendant] in any way, and shall in no way represent any right to do so.  *[Defendant] shall have no control over the terms and conditions of employment of Franchisee's employees*.

Decl. (#30) of Connie Rand, Ex. A at ¶ 3(F)(emphasis added).  In addition, Connie Rand, Vice President of Defendant's Legal Department, testifies in her Declaration that when Defendant franchises a restaurant

> 6.    [It] does not control the terms and conditions of employment of the franchisee employees.  The franchise is exclusively responsible for the terms of employment, compensation, and all aspects of the employment relationship.
>
> 7.    The franchisee handles all aspects of daily operations, including assignment of duties, supervision, training, coaching and discipline of employees.

8.    The franchisee determines who to hire into
      what position at the restaurant.  The
      franchisee decides which employees to
      schedule to work, what days and times to
      schedule them, when the employees will take
      breaks, and the total number of hours the
      employees will be scheduled to work each
      week. Jack in the Box has no input, control
      or direction over schedules, hours, or hiring
      decisions.

                      * * *

12.   Jack in the Box does not provide any employee
      benefits to franchisee employees.

13.   The franchisee is solely responsible for
      payments associated with workers'
      compensation benefits and unemployment.

Rand Decl. at ¶¶ 6-8, 12-13.  Raymund Baluyut, the designated

"franchise operator" for NWG from March 2010 through November

2011, testified at deposition that when NWG purchased the Oregon

franchise restaurants from Defendant, Baluyut made the decisions

about who to hire, who not to offer employment to, and which

positions at Defendant's corporate restaurants that NWG would not

fill at its franchise restaurants.  Decl. of Jennifer N. Warberg,

Ex. F at 8-9, 35.  After the initial hiring period, NWG

restaurant managers made hiring and promotion decisions.  *Id.* at

16-17.  Plaintiffs concede Defendant "did not directly decide who

to hire and fire," but Plaintiffs assert Defendant imposed "very

specific requirements on who the . . . franchisees were allowed

to hire and how."  For example, although the Franchise Agreement

provides the franchisees "shall hire all employees of the

20 - OPINION AND ORDER

Franchised Restaurant, and be fully responsible for the terms of their employment," it also requires franchisees to have at least one Certified Franchise Restaurant Manager at each restaurant. Decl. of Jon Egan, Ex. 3 at 13.  Plaintiffs also point out that the Franchise Agreement prohibits franchisees from inducing employees at other franchise locations "to leave such employment" and from hiring an individual who was employed at another franchise location within six months of the termination of his employment at that location.  Egan Decl., Ex. 3 at 15.

According to Plaintiffs, franchisees were required to follow Defendant's "Hiring the Right People" process and Defendant's handbook that includes Consistent Hiring Process Guidelines.  Plaintiffs, however, do not point to any evidence in the record that supports their assertion.  Defendant, in contrast, points to Baluyut's deposition in which he testified franchisees were not required to use Defendant's "Hiring the Right People" process or Defendant's Consistent Hiring Process Guidelines and that Defendant only provided these materials to franchisees as tools to which they could refer.  Warberg Decl., Ex. F at 31-32.

### 2. Supervision and Control of Franchise Employee Work Schedules and/or Conditions of Employment

Defendant asserts it does not supervise and control franchisee employee work schedules or conditions of employment.  Defendant notes under the terms of the Franchise

21 - OPINION AND ORDER

Agreement and in practice, franchisees are exclusively
responsible for their terms of employment, compensation and
training.  For example, as noted, the Franchise Agreement
provides:

> The franchisee determines who to hire into what
> position at the restaurant.  The franchisee
> decides which employees to schedule to work, what
> days and times to schedule them, when the
> employees will take breaks, and the total number
> of hours the employees will be scheduled to work
> each week.  Jack in the Box has no input, control
> or direction over schedules, hours, or hiring
> decisions.
>
> * * *
>
> Franchisee shall hire all employees of the
> Franchised Restaurant, be exclusively responsible
> for the terms of their employment, compensation
> and training.

Rand Decl., Ex. A at 8, 12.  Rand testifies in her Declaration
that "[t]he franchisee handles all aspects of daily operations,
including assignment of duties, supervision, training, coaching
and discipline of employees"; Defendant "does not control or
direct employee handbooks or employment related policies for
franchise operators[; and Defendant] does not provide employee
handbooks to franchise operators."  Rand Decl. at ¶¶ 7, 10.  In
addition, franchisees

> decide[] which employees to schedule to work, what
> days and times to schedule them when the employees
> will take breaks, and the total number of hours
> the employees will be scheduled to work each week.
> Jack in the Box has no input, control or direction
> over schedules, hours, or hiring decisions.

22 - OPINION AND ORDER

> [Defendant] does not maintain personnel records of
> franchise employees.

Rand Decl. ¶¶ 8-9.  Defendant notes its labor-scheduling software

is an option for franchisees to use, but they are not required to

do so and, in fact, some franchisees choose to hand-write work

schedules.  Warberg Decl., Ex. F at 19-20.

Mauldin testified at deposition that when she was

a team leader at the restaurant after it had been franchised to

NWG, she was responsible for supervising crew members, ensuring

they took breaks, assigning tasks, making sure employees counted

their tills, and "making sure the store ran smoothly."  Warberg

Decl., Ex. G at 2-3.  Similarly, Diaz testified at deposition

that after the restaurant at which he worked was franchised to

NWG, he was "responsible for the employees on the shift,"

including scheduling, when he was the person in charge.  Warberg

Decl., Ex. I at 14, 19.  Jessica Gessele testified at deposition

that after the restaurant she worked at was franchised to NWG,

the shift leader at her restaurant assigned her tasks and set

work and break schedules and a manager was in charge of

scheduling  employees.  Warberg Decl., Ex. H at 6-8.

Baluyut testified at deposition that after NWG

purchased Defendant's franchise restaurants, its Human Resources

Manager independently developed personnel policies and hiring

forms to be used in the franchised restaurants.  Warberg Decl.,

Ex. F at 39-40.  Defendant provides training on new products and

23 - OPINION AND ORDER

equipment to franchise operators, who, in turn, determine how
their franchise employees will be trained.  Warberg Decl., Ex. E
at 4-5.  Jeffrey Tennant, Defendant's Franchise Business
Consultant, testified at deposition that Defendant does not track
franchise company training, and Defendant's "only concern" is
that each of the franchisees has a certified restaurant manager
and someone certified in food safety on shift.  Warberg Decl.,
Ex. E at 15-18.  Tennant testified franchisees may access
Defendant's training tools, but they are not required to use
those training tools.  *Id*. at 6-8.

        Although Plaintiffs concede in their Response that
Defendant did not directly supervise employee work schedules or
conditions of employment, Plaintiffs, nevertheless, assert
Defendant controlled those things by imposing "mandatory
requirements and protocols for franchisee restaurant managers to
follow."  For example, Plaintiffs contend Defendant has a
"mandatory scheduling system," which includes an algorithm "that
gives warning when labor costs exceed [*sic*] percentage of sales."
In support of their contention Plaintiffs cite Defendant's
26-page 20/20 Handbook generally.  Plaintiffs also assert the
20/20 Handbook "includes Well-Staffed requirements of workstation
positioning and daily planner tools with requirements for sales
forecasting and scheduling (including how many to schedule for
each period)" even though Plaintiffs do not identify with

24 - OPINION AND ORDER

specificity where in the 26-page Handbook these requirements are located.

After reviewing the 20/20 Handbook, the Court notes it includes "guidelines" for "effective staffing & planning," but it does not indicate such guidelines are mandatory. Moreover, both Baluyut and Tennant testified at deposition that the scheduling software was optional for franchisees to use, but Defendant did not track or control franchise employee staffing. Suppl. Decl. of Jennifer Warberg, Ex. M at 2-3; Ex. O at 2-3.

### 3.    Rate and Method of Payment of Franchise Employees

Defendant asserts it does not determine the rate or method of payment of franchise employees. Wendy Sanderlin, Defendant's Vice President-Assistant Controller-Account Operations, testifies in her Declaration that Defendant "does not participate in the determination of franchisee employee hourly rates, pay periods, or the manner in which a franchisee operator's employees are paid." Decl. of Wendy Sanderlin at ¶ 4. In addition, franchisees "decide[] what hourly rate to pay [their] employees, and when they will be paid," and they are "solely responsible for all wage payments, employee withholdings, and employer taxes." Id. at ¶¶ 5-6.

Sanderlin testifies in her Declaration that Defendant "does not control any aspect of franchisee payroll

25 - OPINION AND ORDER

processing." Sanderlin Decl. at ¶ 2. Similarly, Baluyut testified at deposition that NWG had a third-party payroll provider when he was a franchise operator, and NWG also determined franchisor's pay period and employees' rates of pay. Warberg Decl., Ex. F at 10, 45-46. Tennant also testified at deposition that Defendant does not provide a payroll system for franchisees and that franchisees "use their own separate payroll." Warberg Decl., Ex. E at 19-20.

In addition, NWG chose not to provide certain benefits to franchise employees that they had received when the restaurants were owned by Defendant. For example, Mauldin testified at deposition that when she worked for Defendant directly, she received medical and dental insurance and was eligible for participation in a 401(k). Warberg Decl., Ex. G at 56. When NWG took over the restaurant, however, employees did not have the option of medical or dental insurance or participation in a 401(k). *Id.* Jessica Gessele and Diaz testified they had been entitled to "fringe benefits" such as insurance when the restaurants they worked at were owned by Defendant, but they were not offered those benefits after NWG bought the franchise for the restaurants. Warberg Decl., Ex. H at 34; Ex. I at 72.

Plaintiffs concede Defendant did not directly determine franchise employees' rates of pay, but "it did have a

26 - OPINION AND ORDER

hand in determining the amount and method of their pay."
Specifically, Plaintiffs contend Defendant required franchisees
to use its time-tracking software and hardware, which calculated
the hours that franchise employees worked and transmitted that
figure to the franchisee for use in payroll.  In fact, Plaintiffs
assert it is Defendant's time-tracking program that caused the
FLSA violations alleged in this matter.  Specifically, Plaintiffs
contend the time-tracking software is configured in such a way
that employees who take a break of more than 20 minutes but less
than 30 minutes are not paid for that break, which, Plaintiffs
assert, violates the FLSA.

### 4.    Maintenance of Franchise Employment Records

As to the final *Bonnette* factor, Defendant asserts
it does not maintain franchisee employment records.  Baluyut
testified NWG kept its employees' personnel records in filing
cabinets in NWG's corporate office in Tigard, Oregon, when
Baluyut was a franchise operator.  Warberg Decl., Ex. F at 25.
In fact, Defendant points out that NWG, in response to
Plaintiffs' subpoena, produced the personnel records for the
named Plaintiffs who it employed in its franchise restaurants.

Plaintiffs, however, assert Defendant maintains
franchise employee personnel records because a franchise employee
must enter his or her name, Social Security number, ethnicity,
gender, date of birth, telephone number, address, emergency

contact information, and driver's license information in order to gain access to Defendant's time-tracking software.

Defendant, in turn, assets franchise employees enter basic identifying information into the time-keeping system when they are hired so that they may access the training modules and use the time-keeping system. Defendant notes, however, that "many elements" of the data-entry process are optional and selected by the franchisee such as ethnicity, gender, etc. Defendant also notes it does not review or audit franchise employee information or time-clock punches. Instead, such information is exported and stored on a "secure FTP site" for franchisees or their payroll processors to retrieve and to use in processing their payrolls.

### C. Evaluation of the *Bonnette* factors

Courts in the Ninth Circuit have evaluated franchisor/franchisee relationships similar to the one here and have concluded such circumstances do not satisfy either the *Bonnette* or *Torres-Lopez* factors when viewed as a whole. For example, in *Singh v. 7-Eleven, Inc.*, the defendant owned and operated retail food stores under the trademark name 7-Eleven. No. C-05-04534 RMW, 2007 WL 715488, at *1 (C.D. Cal. Mar. 8, 2007). In 1999 Cindy Duong purchased a 7-Eleven franchise store pursuant to a written franchise agreement. Pursuant to the agreement Duong and the defendant shared the profits from the

28 - OPINION AND ORDER

store.  Every month the defendant provided Duong with a financial
statement that showed gross sales less the cost of merchandise.
The defendant paid the lease on the building that housed the
store in addition to the water bill and the electric bill.  The
difference between the gross sales and these expenses was split
between the defendant and Duong.  *Id*.  "Then the monthly expenses
such as payroll, payroll tax, EDD insurance, trash, telephone,
maintenance, and miscellaneous expenses [were] deducted from
Duong's share of the gross profit."  *Id*.  The remaining net
profit "was applied to Duong's equity account with the defendant,
from which Duong [could] withdraw funds at her discretion."  *Id*.
In addition, a field consultant for the defendant, Jennifer
Anistik, would visit Duong's franchise store.  Anistik "provided
Duong with merchandising ideas and recommendations, evaluation of
the condition of the store, and other advice on increasing sales
and profits."  *Id*.  Every pay period Duong sent information about
the hours worked by her employees and their rate of pay to the
defendant's accounting department.  The defendant's accounting
department deducted the payroll expenses from Duong's equity
account and sent payroll checks for Duong's employees to Duong
via courier.  *Id*., at *2.  Duong interviewed and hired
individuals to work at the franchise, set employees' rates of
pay, determined promotions, instructed employees on their
specific job duties, and scheduled employees' work shifts.  *Id*.

The plaintiffs filed an action against the defendant seeking to recover unpaid overtime and meal-break compensation under the FLSA and California's wage-and-hour laws.  The defendant moved for summary judgment against, *inter alia*, the plaintiffs' FLSA claims on the ground that it was not the plaintiffs' joint employer.  The court applied the economic reality test, considered the parties "relationship as a whole," concluded the defendant was not the plaintiffs' joint employer, and granted summary judgment for the defendant.  The court noted the franchise agreement gave the exclusive right and responsibility to control hiring and firing to Duong, and the record reflected Duong did, in fact, solely make hiring and firing decisions. *Id.*, at *4.  The court found unpersuasive the plaintiffs' argument that Duong's ability to control hiring and firing was illusory because the franchise agreement could be terminated by the defendant at any time.  *Id.*  The court, however, found "the power to terminate a franchise alone is not sufficient to create a joint employment relationship."  *Id.* (citations omitted).  The court also noted the record reflected Duong "exclusively arranged plaintiffs' workshifts."  *Id*, at *5.  The court did not find persuasive the plaintiffs' argument that the defendant had supervision and control of franchise employees' conditions of employment because the defendant set the store hours, "had total control over the delivery of service by plaintiffs, and had

30 - OPINION AND ORDER

control over the food service and the uniforms to be worn." The
court noted "simply setting the standards without actual control
of the day-to-day operations is not sufficient to establish an
employer-employee relationship between [the defendant] and
plaintiffs." *Id.* (citing *Alberter v. McDonald's Corp.*, 70 F.
Supp. 2d 1138, 1145 (D. Nev. 1999), and *Thomas v. Freeway Foods,
Inc.*, 406 F. Supp. 2d 610, 617 (M.D.N.C. 2005)). "Such policies
are merely reflective of an inherent interrelation of operations
between the two entities and [the defendant's] goal of attaining
conformity to certain operational standards and details." *Id.*
(citing *Scales v. Sonic Indus., Inc.*, 887 F. Supp. 1435, 1439
(E.D. Okla. 1995)("Outside of the necessary control over
conformity to standard operational details inherent in many
franchise settings, McDonald's only real control over [the
franchisee] was its power to terminate the franchises.")). The
plaintiffs also asserted Anistik, Defendant's field consultant,
inspected the plaintiff's uniforms and instructed the plaintiffs
to check customers' identification when selling alcoholic
beverages and cigarettes. The court, however, concluded "such
actions do not raise a material issue of fact regarding [the
defendant's] control of the workplace or conditions of
employment." *Id.* Finally, the plaintiffs asserted the defendant
had control over franchise employees' payroll functions
"including keeping and generating time records; withholding and

31 - OPINION AND ORDER

paying federal and state taxes, worker's compensation premiums,
and EDD taxes; calculating, generating, and delivering the
employees' paychecks; filing quarterly returns; and providing
employees with annual W2's." *Id.*, at *6.  The court, however,
concluded those "ministerial functions are insufficient to
support plaintiffs' argument that [the defendant] controls labor
relations.  Providing a 'payroll service to a franchisee's
employees does not in any manner create an indicia of control
over labor relations sufficient to demonstrate that the
franchisor is a joint employer.'" *Id.* (quoting *Hatcher v.
Augustus*, 956 F. Supp. 387, 392 (E.D.N.Y. 1997)).  The court
noted the defendant

> was not responsible for setting plaintiffs' wages,
> using its funds to pay plaintiffs, or providing
> any employment benefits.  The record indicates
> [the defendant] has not utilized its own funds to
> pay any portion of the compensation to plaintiffs.
> All payroll funds and taxes were directly debited
> from Duong's equity account.  Although [the
> defendant] generates paychecks, this is merely a
> convenience for the franchisees. . ., who provided
> all relevant wage and tax information.

*Id.*  As noted, the court concluded, after considering the
relationship as a whole, that the defendant was not the
plaintiffs' employer under the economic reality test.

Similarly in *Courtland v. GCEP-Surprise, LLC*, Buffalo
Wild Wings, Inc. (BWWI) owned and operated over 250 restaurants
as corporate-owned locations and franchised more than 470 Buffalo
Wild Wings restaurants.  No. CV-12-00349-PHX-GMS, 2013 WL

3894981, at *1 (D. Ariz. Jul. 29, 2013).  In October 2007 GCEP
entered into a franchise agreement with BWWI to operate a
franchised restaurant.  Pursuant to the franchise agreement GCEP
was responsible for "the hire, training, discipline,
compensation, and termination of all Restaurant employees." *Id*.
The agreement also set out guidelines "regarding plant
maintenance, product presentation and service, insurance, and use
of the BWWI trademark." *Id*.  BWWI mandated training for the
franchise restaurant's general manager, operational manager, and
assistant manager "directed towards product presentation and
service." *Id*.  The training, however, did not involve human
resources or franchise employment matters.  BWWI performed
periodic evaluations of the Restaurant to ensure compliance with
the agreement's guidelines, but the "evaluators did not review
employee management and had minimal interaction with
non-managerial staff." *Id*.  Supplemental materials provided by
BWWI to franchise owners relating to franchise restaurant
employment matters "was merely advisory." *Id*.  The plaintiff, an
employee of a BWWI franchise restaurant, brought a Title VII
claim against BWWI and GCEP.  BWWI moved for summary judgment on
the plaintiff's claims against it on the ground that it was not
the plaintiff's joint employer pursuant to the economic realities
test.  The court found BWWI was not the plaintiff's joint
employer and granted BWWI's motion for summary judgment.  The

court stated:  "A franchisor is not a joint employer unless it
has significant control over the employment relationship." *Id.*,
at *3.  The court noted BWWI did not have the right to hire, to
supervise, or to fire employees nor did BWWI compensate franchise
employees.  In addition, GCEP "was responsible for payroll,
scheduling, and employee recordkeeping as well as worker's
compensation claims and unemployment insurance . . . [and]
independently determined how its employees were reviewed,
promoted and disciplined." *Id.*, at *4.  BWWI also did not train
nonmanagerial staff nor did it "provide assistance with respect
to HR issues, mandate HR training, or monitor the Restaurant's HR
policies." *Id.*  Although BWWI set out in the agreement
"guidelines regarding plant maintenance, products and operations,
liability insurance, indemnification, periodic inspection, and
use of the BWWI logo," it did so only "to maintain and develop
the good will behind its franchise," which "does not equate [to]
joint employment [because BWWI did so] for a . . . purpose . . .
different than [that of] the employer." *Id.*, at *3-4.  Although
BWWI had the power to terminate the franchise, "that supervision
alone is not sufficient to create a joint employment
relationship." *Id.* (quotation omitted).

      Courts outside of the Ninth Circuit have also concluded
franchisors were not franchise employees' joint employers under
circumstances similar to those here.  For example in *Evans v.*

*McDonald's Corporation* the court concluded the defendant

franchisor was not the plaintiff's joint employer:

> Control is, we agree, an important factor in any
> determination of this issue.  *See Wheeler*, 825
> F.2d at 270 (control over details and results of
> worker's performance is the most important factor
> in determining employer/employee relationship)
> . . . .  McDonald's did not exert the type of
> control that would make it liable as an employer
> under Title VII.  McDonald's may have stringently
> controlled the manner of its franchisee's
> operations, conducted frequent inspections, and
> provided training for franchise employees.  The
> record also indicates, however, that McDonald's
> did not have control over Everett Allen's labor
> relations with his franchise employees.  *See
> Armbruster*, 711 F.2d at 1337-38 (control over
> elements of labor relations is a central concern);
> *Carter*, 470 F. Supp. at 1161 (without control over
> labor relations, stringent control over details of
> independent operators did not make defendant an
> employer of operator's employees).  McDonald's did
> not have financial control over Everett Allen's
> franchises.  Outside of the necessary control over
> conformity to standard operational details
> inherent in many franchise settings, McDonald's
> only real control over Everett Allen was its power
> to terminate his franchises.

936 F.2d 1087, 1090 (10th Cir. 1991).  In *Scales v. Sonic

Industries, Inc.*, the court held the defendant franchisor was not

the plaintiff's joint employer:

> [The] provisions [of Sonic's Operation Manual]
> cited by Scales are insufficient to support her
> argument that Sonic controls the labor relations
> with respect to the Idabel restaurant's employees
> . . . .  Sonic's policy statement and appeal
> process fall woefully short of establishing the
> necessary control to impose Title VII liability on
> Sonic.  In contrast to the almost total lack of
> control over employment decisions and the Idabel
> restaurant's day-to-day operations established by
> [the record], Sonic's policy statement and appeal

> process are merely reflective of an inherent
> interrelation of operations between the two
> entities and Sonic's goal of attaining conformity
> to certain operational standards and details
> . . . . Sonic's Operation Manual does not vest
> ultimate control over labor relations in Sonic,
> but rather, that authority remains with the
> franchisee who is merely guided in its employment
> decisions by the content of the license/franchisee
> agreement with Sonic.

87 F. Supp. 1435, 1439-40 (E.D. Okla. 1995).

Here, as in *Singh*, *Courtland*, *Evans*, and *Scales*,
Defendant has established it does not have the power to hire or
to fire franchise employees and it is not responsible for or
involved in franchise employee work schedules, hours of
employment, salaries, insurance, fringe benefits, or hours of
work. Although Defendant provides some training to the
individuals in the person-in-charge position, it is not involved
in nonmanagerial employee training. Even though franchises are
required to use Defendant's payroll system and Defendant's system
aggregates the data and sends it to franchisees' payroll
providers, the *Singh* court noted such "ministerial functions are
insufficient to support plaintiffs' argument that [defendant]
controls labor relations. Providing a 'payroll service to a
franchisee's employees does not in any manner create an indicia
of control over labor relations sufficient to demonstrate that
the franchisor is a joint employer.'" 2007 WL 715488, at *6
(quoting *Hatcher*, 956 F. Supp. at 392). In addition, Defendant's
provision of nonmandatory advisory materials relating to Human

36 – OPINION AND ORDER

Resources and the training of franchise employees does not establish Defendant has control over the franchise employees.

Taking the circumstances of Defendant's relationship with NWG as a whole and applying the *Bonnette* factors, the Court concludes Plaintiffs have not established as a matter of law that Defendant was their joint employer.

### D. *Tores-Lopez* Factors

The regulatory factors set out in *Torres-Lopez* overlap the *Bonnette* factors. Specifically, in this case the Court has already addressed the nature and degree of Defendant's control over NWG workers; Defendant's degree of supervision of franchise employees' work; Defendant's power to determine the pay rates or the methods of payment of NWG's workers; Defendant's right to hire, to fire, or to modify the employment conditions of NWG workers; and Defendant's preparation of payroll and the payment of wages to NWG workers. In addition, the Court has concluded an evaluation of these factors based on the circumstances of this case does not establish Defendant was Plaintiffs' joint employer. With respect to the nonregulatory factors, the Court concludes most of them do not apply to this matter because they relate to whether individuals are independent contractors or employees, a question that is not at issue here. With respect to the nonregulatory factors, the Court, however, notes Defendant owns the equipment and premises of the NWG restaurants.

Viewing the evidence in the light most favorable to Plaintiffs, the Court concludes on this record that Plaintiffs have not established as a matter of law that Defendant was their joint employer.  Accordingly, the Court grants Defendant's Motion for Summary Judgment on Plaintiffs' FLSA claims.

## II.  Diaz's claims are subject to mandatory arbitration.

Defendant moves for summary judgment as to all of Diaz's claims on the ground that they are subject to mandatory arbitration.  Specifically, Defendant notes Diaz signed an enforceable arbitration agreement with Defendant on July 29, 2008, which requires Diaz to arbitrate the claims he has brought in this action.

Plaintiffs assert the arbitration agreement on which Defendant relies is not enforceable because Defendant has not established Diaz signed the agreement; if he did sign the agreement, Diaz was a minor when he did so; Defendant waived the arbitration agreement; and/or the agreement is illegal under the NLRA and the FLSA.

### A.    Diaz signed the arbitration agreement.

As noted, Plaintiffs assert Defendant has not established Diaz signed the arbitration agreement.  Defendant, however, points out that Diaz electronically signed the arbitration agreement using a "Jack in the Box CBT terminal." Specifically, as part of the new-hire process at Jack in the Box,

Diaz affirmatively accepted the arbitration agreement by logging
onto a CBT terminal, reviewing the agreement, clicking "yes" that
he agreed to the terms, and entering his confidential password to
record his agreement.  In addition, James Stubblefield,
Defendant's former attorney, testified in his Declaration that
Diaz electronically signed the agreement on July 29, 2008.
*See* Decl. of James Stubblefield at ¶ 2, *Gessele I* (#242).
Stubblefield testified he is one of Defendant's custodians of
records, and, as such, he reviewed the electronic-acknowledgment
record maintained by Defendant's Human Resources Department.
Defendant also filed a document that describes the electronic-
agreement process used at the time tat Diaz electronically signed
the arbitration agreement.  *See* Decl. of Susan Pettijohn at ¶¶ 2-
3, Ex. AA.  Oregon law specifically permits electronic signatures
to bind individuals to agreements.  *See, e.g.,* Oregon Revised
Statute § 84.004(8)("Electronic signature" means an electronic
sound, symbol or process attached to or logically associated with
a record and executed or adopted by a person with the intent to
sign the record."); Oregon Revised Statute § 84.019(1)("A record
or signature may not be denied legal effect or enforceability
solely because it is in electronic form.").

On this record the Court concludes Defendant has
established Diaz signed the arbitration agreement in a legally
binding and acceptable manner.

39 - OPINION AND ORDER

**B.    Diaz is bound by the arbitration agreement.**

Plaintiffs also assert Diaz is not bound by the agreement because he signed it when he was a minor and repudiated it on January 4, 2011, when he filed his individual action against Defendant and NWG.  Defendant, however, contends Diaz did not repudiate the contract within a reasonable time after attaining majority and/or Diaz should be estopped from asserting that he repudiated the contract because Diaz retained the benefit of the bargain (*i.e.*, employment) after he attained majority.

It is undisputed that Diaz was born on January 7, 1992, and that he was 16 years old when he signed the arbitration agreement and began working in a restaurant owned by Defendant at the time.  It is also undisputed that Diaz attained the age of majority (18 years old) on January 7, 2010, and continued to work in the restaurant owned by Defendant and subsequently by NWG.

Oregon law permits minors age 16 and older to work with certain limitations on hours and days per week.  *See* Or. Rev. Stat. § 653.315.  Oregon law, however, also provides individuals do not attain majority until they are 18 years of age and, as a result, may not (with certain specific exceptions) enter into binding contracts until age 18.  Or. Rev. Stat. § 109.510. Nevertheless, Oregon courts have held

> a former minor may disaffirm a contract within a
> "reasonable time" after reaching the age of
> majority, *see Highland v. Tollisen*, 75 Or. 578,
> 587 (1915), or, conversely, may ratify a contract

> after reaching the age of majority by manifesting
> an intent to let the contract stand, *see Haldeman
> v. Weeks*, 90 Or. 201, 205 (1918); see also Richard
> A. Lord, 5 Williston on Contracts § 9:17, 166-70
> (4th ed. 2009)("[I]f an infant after reaching the
> age of majority engages in any conduct that
> objectively manifests an intent to regard the
> bargain as binding, the former minor will be held
> as a matter of law to have ratified the
> contract."). Further, . . . although what
> constitutes a reasonable period of time after
> reaching the age of majority varies widely
> depending on the circumstances, it is well
> established that ratification of a voidable
> contract abolishes a party's power to later
> disaffirm it. *See Brown et ux. v. Hassenstab et
> ux.*, 212 Or. 246, 256 (1957)("The two courses of
> action are inconsistent and the taking of one will
> preclude the other."); *Snyder v. Rhoads*, 47 Or.
> App. 545, 553-54, 615 P.2d 1058, rev. den., 290
> Or. 157 (1980)(similar).

*Bagley v. Mt. Bachelor, Inc.*, 258 Or. App. 390, 398-99 (2013),

*overruled on other grounds by Bagley v. Mt. Bachelor*, 356 Or. 543

(2014).

        Here Diaz continued to work in the restaurant owned by

Defendant and subsequently by NWG after he reached age 18. The

Court finds continuing to work under the terms of the contract

after attaining the age of majority constitutes "conduct that

objectively manifests an intent to regard the bargain as

binding." Thus, Diaz ratified the terms of his employment

contract, including the arbitration agreement, after attaining

majority and, therefore, "abolish[ed] [his] power to later

disaffirm it." Accordingly, the Court concludes Diaz is bound by

the arbitration agreement.

41 - OPINION AND ORDER

## C.    Defendant did not waive its right to enforce the arbitration agreement.

Plaintiffs assert even if Diaz signed and ratified the agreement, Defendant waived the right to enforce the arbitration agreement because it failed to assert the right to arbitrate in Diaz's individual action against Defendant and NWG.  Defendant does not address Plaintiffs' waiver argument in its Reply.

Specifically, Plaintiffs assert NWG and other franchisee defendants moved to compel arbitration in Diaz's individual case, but Defendant did not file its own motion to compel arbitration or move to join the other defendants' motions. Plaintiffs further assert Defendant "filed two different answers in that case, four months apart, each asserting many affirmative defenses, and never once raised the issue of arbitration at any time in the six months of litigation before the case was dismissed."  Plaintiffs contend Defendant's conduct constitutes waiver.

In its initial answer filed in Diaz's individual case Defendant asserted, among other things, an affirmative defense of waiver and/or estoppel as follows:  "Plaintiff, by his action and/or omission, has waived and/or is otherwise estopped from asserting claims against Defendant Jack in the Box, Inc." *Diaz v. Jack in the Box, Inc.*, No. 3:11-CV-0006-JO, Answer (#3) at ¶ 57.  One month after Defendant filed its initial answer, NWG filed a motion to compel arbitration and to stay the matter

42 - OPINION AND ORDER

pending arbitration relying on the arbitration agreement between Diaz and NWG that was signed by Diaz on March 29, 2010, after NWG purchased from Defendant the franchise for the restaurant at which Diaz worked.  Defendant did not file a motion to compel arbitration pursuant to the arbitration agreement that Diaz signed with Defendant in July 2008.  On May 30, 2011, Diaz filed an amended complaint in his individual matter.  On June 16, 2011, Defendant filed an answer to Diaz's amended complaint in which it again asserted an affirmative defense of estoppel.  Less than a month later on July 6, 2011, Diaz filed an unopposed motion to dismiss his claims against Defendant without prejudice.

Under Oregon law "a waiver is the 'intentional relinquishment of a known right.'"  *Wood Park Terrace Apartments Ltd. P'ship v. Tri-Vest, LLC*, 254 Or. App. 690, 695 (2013) (quoting *Guardian Mgmt. LLC v. Zamiello*, 194 Or. App. 524, 529 (2004)).  With respect to waiver, Oregon courts have held:

> "[I]n the absence of an express agreement a waiver will not be presumed or implied contrary to the intention of the party whose rights would be injuriously affected thereby, unless by his conduct the opposite party has been misled, to his prejudice, into the honest belief that such waiver was intended or consented to.  To make out a case of waiver of a legal right there must be a clear, unequivocal, and decisive act of the party showing such a purpose or acts amounting to an estoppel on his part.

*Baumgarner v. Cmty. Svcs., Inc.*, 992 F. Supp. 2d 1081, 1088 (D. Or. 2014)(quoting *Brown v. Portland Sch. Dist. No. 1*, 291 Or. 77,

43 - OPINION AND ORDER

84 (1981)).  The Ninth Circuit has made clear that "[w]aiver of a contractual right to arbitration is not favored," and, therefore, any party arguing waiver of arbitration bears a heavy burden of proof."  *Richards v. Ernst & Young, LLP*, 744 F.3d 1072, 1074 (9th Cir. 2013)(quotation omitted).  When "the concern is whether the undisputed facts of defendant's pretrial participation in the litigation satisfy the standard for waiver, the question of waiver of arbitration is one of law."  *Id.*

Plaintiffs do not cite any cases in which a defendant was held to have waived an affirmative defense when the defendant timely asserted the defense in its answer but did not file a motion as to the affirmative defense at the time the other defendants did so.  In fact, courts have held even *untimely* assertions of an affirmative defense are insufficient to establish prejudice or waiver.  *See, e.g., Owens v. Kaiser Found. Health Plan, Inc.,* 244 F.3d 708, 713 (2001)("We conclude, however, that Kaiser's knowledge that Appellants' previous action had been dismissed is insufficient to demonstrate waiver of the affirmative defense of *res judicata* in the absence of any representation by Kaiser that it did not intend to assert that defense before trial."); *Baumgarner*, 992 F. Supp. 2d at 1088-89 ("[M]ere untimely assertion of an affirmative defense is insufficient to establish prejudice.  In the absence of any factual basis showing Defendant voluntarily relinquished its

right to rely on the Tort-Claim Notice requirements of the OTCA, the Court declines to conclude that Defendant waived its Affirmative Defense of Plaintiff's failure to provide Defendant with OTCA notice."). Similarly in *Richards* the Ninth Circuit reversed the district court's decision that the defendant "had waived its right to arbitration by failing to assert that right as a defense in an action brought by two other former employees, David Ho and Sarah Fernandez, whose action had been consolidated with that of Ms. Richards." 744 F.3d at 1074.

Defendant asserted the affirmative defense of estoppel in both of its answers filed in Diaz's individual case. Other than not filing a motion to compel arbitration during the short duration of Diaz's individual case, Plaintiffs do not identify any actions by Defendant nor does the record reflect any actions by Defendant that constitute "a clear, unequivocal, and decisive act . . . showing such a purpose or acts amounting to an estoppel on [its] part" sufficient to establish waiver as a matter of law. The Court, therefore, concludes Defendant did not waive its right to assert arbitration.

**D.   The arbitration agreement is illegal under the National Labor Relations Act (NLRA), 29 U.S.C. § 151, *et seq*.[4]**

Finally, Plaintiffs assert the arbitration agreement is

---

[4] Like the Ninth Circuit in *Morris*, this Court concludes "because the contract's conflict with the NLRA is determinative, we need not—and do not—reach [Plaintiffs'] alternative arguments regarding the . . . the FLSA." 834 F.3d at 990.

illegal under the NLRA and/or the FLSA.  Specifically, Plaintiffs
assert the provision of the arbitration agreement that states
"[n]either Employee nor Company shall be entitled to join or
consolidate in arbitration claims . . . or arbitrate a
representative action or a claim as a representative or member of
a class" violates the mutual aid and protection clause of the
NLRA, 29 U.S.C. § 157, and the collective action provision of the
FLSA, 29 U.S.C. § 216.  Plaintiffs rely on the Ninth Circuit's
recent decision in *Morris v. Ernst & Young, LLP*, 834 F.3d 975
(9th Cir, 2016), to support their assertion.

         In *Morris* the plaintiffs brought putative class and
collective action against the defendant for allegedly
misclassifying them and similarly-situated employees as exempt
employees in violation of the FLSA and California labor laws.
The defendant moved to compel arbitration pursuant to a
"concerted action waiver," which employees were required to sign
as a condition of employment.  834 F.3d at 979.  The concerted-
action waiver

                    required employees to (1) pursue legal claims
                    against [the defendant] exclusively through
                    arbitration and (2) arbitrate only as individuals
                    and in "separate proceedings."  The effect of the
                    two provisions [was] that employees could not
                    initiate concerted legal claims against the
                    company in any forum — in court, in arbitration
                    proceedings, or elsewhere.

*Id*.  The district court granted the motion to compel arbitration
on the basis of the concerted-action waiver, and the plaintiffs

46 – OPINION AND ORDER

appealed.  The Ninth Circuit reversed the district court and held

the concerted-action waiver violated §§ 7 and 8 of the NLRA

because it prohibited employees from bringing a concerted action

in any forum:

> Applied to the [defendant's] contract, § 7 and § 8
> [of the NLRA] make the terms of the concerted
> action waiver unenforceable.  The "separate
> proceedings" clause prevents concerted activity by
> employees in arbitration proceedings, and the
> requirement that employees only use arbitration
> prevents the initiation of concerted legal action
> anywhere else.  The result:  interference with a
> protected § 7 right in violation of § 8.  Thus,
> the "separate proceedings" terms in the
> [defendant's] contracts cannot be enforced.

*Id*. at 984-85.  The Ninth Circuit also found the concerted-action

waiver was not enforceable under the FAA:

> The contract defense in this case does not "derive
> [its] meaning from the fact that an agreement to
> arbitrate is at issue." *Concepcion*, 563 U.S. at
> 339.  An agreement to arbitrate work-related
> disputes does not conflict with the NLRA.  Indeed,
> federal labor policy favors and promotes
> arbitration.
>
> The illegality of the "separate proceedings" term
> here has nothing to do with arbitration as a
> forum.  It would equally violate the NLRA for
> Ernst & Young to require its employees to sign a
> contract requiring the resolution of all work-
> related disputes in court and in "separate
> proceedings."  The same infirmity would exist if
> the contract required disputes to be resolved
> through casting lots, coin toss, duel, trial by
> ordeal, or any other dispute resolution mechanism,
> if the contract (1) limited resolution to that
> mechanism and (2) required separate individual
> proceedings.  The problem with the contract at
> issue is not that it requires arbitration; *it is*
> *that the contract term defeats a substantive*
> *federal right to pursue concerted work-related*

47 - OPINION AND ORDER

*legal claims*.

*Id*. 984-85 (emphasis added)(citations omitted).

The Ninth Circuit's holding in *Morris* is clear:  A provision in an employment contract that prohibits employees from pursuing concerted work-related legal claims (such as collective actions under the FLSA or class actions under state law), whether in arbitration or in court, violates the NLRA's substantive right and cannot be enforced under the FAA or otherwise.

As noted, here the arbitration agreement provides "[n]either Employee nor Company shall be entitled to join or consolidate in arbitration claims . . . or arbitrate a representative action or a claim as a representative or member of a class."  That provision seeks to prohibit employees from pursuing concerted work-related claims.  The Court, therefore, concludes the clause of the arbitration agreement prohibiting consolidated action violates the NLRA and is unenforceable.

In its Reply Defendant asserts the arbitration agreement does not violate the NLRA because it contains a severability clause permitting the Court to sever the concerned-action prohibition of the agreement.  Specifically, the arbitration agreement provides:

> **Severability**
> The provisions of this Agreement are severable and
> independent, and the invalidity, illegality or
> unenforceability of any provision herein shall not
> affect the validity, legality or enforceability of
> the remaining provisions of this Agreement.

48 - OPINION AND ORDER

Stubblefield Decl,, Ex. 1, at 5-6 (*Gessele I,* #242).  In *Morris*
the Ninth Circuit specifically acknowledged the possibility of a
court severing an unenforceable prohibition on concerted action
from an arbitration agreement and enforcing the remainder of the
agreement if possible:

> *Stolt-Nielsen S.A. v. AnimalFeeds International
> Corp.,* 559 U.S. 662 (2010), is not to the
> contrary.  Under *Stolt*, an arbitrator may not add
> to the terms of an arbitration agreement, and
> therefore may not order class arbitration unless
> the contract provides for it.  *Id.* at 684.  This
> does not require a court to enforce an illegal
> term.  Nor would *Stolt* prevent the district court,
> on remand, from severing the "separate
> proceedings" clause to bring the arbitration
> provision into compliance with the NLRA.

834 F.3d at 998, n.8.  In fact, in *Morris* the Ninth Circuit
concluded:

> Because the district court's order compelling
> arbitration was based, at least in part, on the
> separate proceedings provision, we must vacate the
> order and remand to the district court to
> determine whether the "separate proceedings"
> clause is severable from the contract.  We take no
> position on whether arbitration may ultimately be
> required in this case.

*Id.* at 990.

The Ninth Circuit has held when an arbitration
agreement includes a severability clause such as the one at issue
here, "the offending clause waiving representative claims may be
severed from the rest of the agreement."  *Hopkins v. BCI
Coca-Cola Bottling Co. of Los Angeles*, 640 F. App'x 672, 673 (9th
Cir. 2016)(court severed the offending clause pursuant to a

49 - OPINION AND ORDER

severability provision that stated "[t]he invalidity or unenforceability of any provision shall not affect the application of any other provision.").

Accordingly, the Court severs the provision of the arbitration agreement at issue in this case that prohibits employees from concerted action.  The Court concludes the remainder of the arbitration agreement is valid and enforceable and, therefore, grants Defendant's Motion for Summary Judgment as to Diaz's claims on the ground that those claims are subject to mandatory arbitration under the terms of the modified arbitration agreement.

**III. Whether the FLSA claims of any California putative collective-action members are subject to the settlements in the *Frederick* and *Olvera* cases is not ripe.**

Defendant also moves for partial summary judgment on the ground that the FLSA claims of any California putative collective-action members are subject to the settlements in the *Frederick* and *Olvera* cases.  Specifically, Defendant asserts two court-approved settlements of California wage-and-hour class actions "bar[] the relitigation of the FLSA claims of those California class members [in *Gessele II*] who did not opt-out of the *Frederick* and *Olvera* settlements."

Plaintiffs assert even in cases in which courts have held plaintiffs may waive in settlement their right to bring a future collective action, no court has reached that conclusion with

50 - OPINION AND ORDER

respect to "class waivers."  Plaintiffs point out that the cases relied on by Defendant involved an individual release signed by an individual plaintiff in exchange for a severance package rather than a class release.  According to Plaintiffs, this distinction is critical because the FLSA requires each plaintiff to opt in to a collective action in order to be bound by the result of the collective action.  *See, e.g., Allen v. Bedolla*, 787 F.3d 1218, 1221 (9th Cir. 2015)("The settlement releases or forecloses all of the claims that [the plaintiff] asserted, or could have asserted, against [the employer], including meal and rest break claims that he did not make, except that class members who do not make a claim will not release any claims under FLSA, and class members who opt out will not be held to release any claims made in the lawsuit for individual relief."); *Dickerson v. Cable Commc'ns, Inc.*, No. 3:12-CV-00012-PK, 2013 WL 6178460, at *3 n.6 (D. Or. Nov. 25, 2013)("The Court notes that under the Settlement Agreement, all class members release relevant state law causes of action, whereas only Qualified Claimants who opted-in to the settlement release the relevant FLSA causes of action.").  In addition, Plaintiffs note courts have disapproved otherwise valid global state-law class-action releases when they include a global release of FLSA claims.  For example, in *Apparicio v. Radioshack Corporation* the court held the release violated federal law:

51 - OPINION AND ORDER

> The release covers '[a]ll claims, demands, rights, liabilities, and causes of action of every nature and description . . . for violation of any state or **federal** statute, rule or regulation, including state or **federal** wage and hour laws' arising out of or related to the allegations in the First Amended Complaint. However, under the federal Fair Labor Standards Act, no member of the class is either bound by the class action adjudication or barred from filing an individual claim within the limitations period **unless he opts** to become a party. Thus, a class member can only release her federal FLSA claims if she opts in, giving her consent in writing to become a party. As the settlement agreement and proposed class notice is currently drafted, putative class members who do not respond to the notice by either filing a claim form or a timely request for exclusion are deemed covered by the claims release. The FLSA will not allow this. Thus, if the parties wish to include FLSA claims within the scope of the release, they must modify the terms such that those class members who do not respond do not release any FLSA claims they may have."

CV 08-1145 GAF AJWX, 2009 WL 1490560, at *2 (C.D. Cal. May 21, 2009)(emphasis in original).

Plaintiffs note *Frederick* and *Olvera* did not involve FLSA collective-action claims, which require plaintiffs to affirmatively opt in if they wish to be bound by the result of the collective action. Instead they included only state wage-and-hour class-action claims, which require putative plaintiffs to opt out if they do not wish to be bound by the result of the class action. Plaintiffs assert the "class members in *Frederick* and *Olvera* may not even have received notice of those actions, let alone opted in," and "neither of the class notices informed class members that they would be waiving FLSA rights unless they

opted out or objected." Plaintiffs note Defendant "has not cited any cases, and plaintiffs' counsel's research has not revealed any, holding that a non-named class member in a state-law class is barred from bringing an FLSA claim by an earlier class settlement's general release." According to Plaintiffs, therefore, putative California collective-action plaintiffs in this matter are not prohibited from bringing FLSA claims by the settlements in *Frederick* and *Olvera*.

On October 19, 2016, Defendant submitted the case of *Richardson v. Wells Fargo Bank, N.A.*, 839 F.3d 442 (5th Cir. 2016), as a supplemental authority to support its assertion that putative California collective-action plaintiffs in this matter are barred by the settlements in *Frederick* and *Olvera* from bringing FLSA claims. In *Richardson* the plaintiffs filed an action against the defendant employer alleging it improperly classified them as exempt employees and failed to pay appropriate overtime in violation of the FLSA. Separate from the *Richardson* action, numerous California employees of the defendant filed a class action against the defendant in California state court alleging violations of the FLSA and California's wage-and-hour laws (the *Lofton* action). Ultimately the plaintiff and defendant reached a settlement in the *Lofton* action and, as part of the settlement process, *Lofton* class members were sent notice of the proposed settlement, a claim form, and an exclusion form. In

53 - OPINION AND ORDER

order to receive a portion of the settlement, class members had
to fill out and return the claim form.  To opt out of the
settlement, class members had to fill out and return the
exclusion form.  839 F.3d at 445.  The *Lofton* settlement included
a release, "which the notice sent to class members recounted."
*Id*.  In particular, the *Lofton* release included a release of "any
and all applicable state and federal law wage-and-hour claims,
rights, demands, liabilities, and causes of action of every
nature and description, whether known or unknown, arising during
the Class Members' Released Period . . . including any existing
under the Fair Labor Standards Act." *Id.* at 445-46.  The court
approved the *Lofton* settlement.  In the *Richardson* action,
"[a]fter the district court conditionally certified two
collective actions, the majority of those who had opted in
settled their claims in an agreement approved by the district
court.  Th[e] settlement, however, excluded 1,516 plaintiffs who
had opted into the [*Richardson*] but were members of [the *Lofton*
action]('California Plaintiffs')." *Id*. at 444-45.  The defendant
moved for summary judgment in *Richardson* asserting the California
plaintiffs who were not included in the settlement were precluded
from asserting their claims by the *Lofton* settlement because none
of the California plaintiffs had opted out of *Lofton*.  The
district court granted the defendant's motion ane found, among
other things, that "the waiver of FLSA claims as part of the

54 - OPINION AND ORDER

*Lofton* settlement ha[d] *res judicata* effect even though it was accomplished through an opt out class action" *Id*. at 448.  The plaintiffs appealed.  The Fifth Circuit affirmed.

As noted, Defendant asserts *Richardson* supports its argument that putative California plaintiffs in this matter are barred from bringing claims against Defendant under the terms of the *Frederick* and *Olvera* settlements.  The procedural posture of *Richardson*, however, differs from this action in that the *Richardson* court had already conditionally certified two collective actions, and the members of those classes, therefore, had been definitively identified.  Here the Court has not certified any class or collective action, conditionally or otherwise.  Further, it is not certain that a class or collective action will be certified in this matter or whether such a class or collective would include any California plaintiffs who were also members of the *Frederick* or *Olvera* settlements.  The Court, therefore, concludes the question of the *res judicata* effect of the *Frederick* and *Olvera* settlements to potential collective-action Plaintiffs in this matter is not ripe, and any decision by this Court on that issue would be an impermissible advisory opinion at this stage of the litigation.  *See, e.g., Maldonado v. Morales*, 556 F.3d 1037, 1044 (9th Cir. 2009)(The role of the courts is "neither to issue advisory opinions nor to declare rights in hypothetical cases, but to adjudicate live cases or

controversies.").

Accordingly, the Court denies as premature Defendant's Motion for Partial Summary Judgment as to the *res judicata* effect of the *Frederick* and *Olvera* settlements to potential collective-action Plaintiffs in this matter.

<u>**CONCLUSION**</u>

For these reasons, the Court **GRANTS in part** and **DENIES in part** Defendant's Motion (#95) for Partial Summary Judgment as follows:

1.    **GRANTS** Defendant's Motion as to Plaintiffs' FLSA claims from March 29, 2010, on the ground that Defendant was not Plaintiffs' joint employer during that period;

2.    **GRANTS** Defendant's Motion as to Plaintiff Jason Diaz's state and federal claims on the ground that he is required to arbitrate those claims under the terms of the arbitration agreement as amended by the Court; and

3.    **DENIES** Defendant's Motion as **premature** as to the FLSA claims of California putative class members subject to the class settlements in the *Frederick* and *Olvera* cases.

The Court **DIRECTS** the parties to confer and to file **no later than January 17, 2017,** a Joint Status Report identifying the claims and Plaintiffs that remain in this matter and specifying a jointly proposed case-management schedule to advance this case to

56 – OPINION AND ORDER

ultimate resolution.  The Court will set a status conference with the parties after receiving and reviewing the Joint Status Report.

     IT IS SO ORDERED.

     DATED this 13th day of December, 2016.


                        /s/ Anna J. Brown

                        _____
                        ANNA J. BROWN
                        United States District Judge