IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JESSICA GESSELE, ASHLEY ORTIZ,                    No. 3:14-CV-01092-HZ
NICOLE GESSELE, TRICIA
TETRAULT, and CHRISTINA                           OPINION & ORDER
MAULDIN, on behalf of themselves and
all others similarly situated,

        Plaintiffs,

v.

JACK IN THE BOX, INC., a corporation
of Delaware,

        Defendant.


Jon M. Egan
240 6th Street
Lake Oswego, OR 97034-2931
(503) 697-3427

Jim W. Vogele
812 N.W. 17th Avenue
Portland, OR 97209
(503) 779-5415

        Attorney for Plaintiffs

Douglas S. Parker
David P. R. Symes
LITTLER MENDELSON, P.C.
1300 S.W. 5th Avenue
Suite 2050
Portland, OR 97201

1 - OPINION & ORDER

(503) 221-0309
Ian Maher
LITTLER MENDELSON, P.C.
633 West 5th Street
Los Angeles, CA 90071
(213) 443-4300

      Attorneys for Defendant

HERNÁNDEZ, District Judge:

      This matter comes before the Court on Defendant's Motion to Correct Verdict, ECF 394;

Defendant's Motion to Reduce Unconstitutionally Excessive Damage Awards, ECF 397; and

Defendant's Motion to Limit Prejudgment Interest for Delays Attributable to Plaintiffs, ECF 399.

      For the reasons that follow, the Court grants Defendant's Motion to Correct Verdict,

denies Defendant's Motion to Reduce Unconstitutionally Excessive Damage Awards, and denies

Defendant's Motion to Limit Prejudgment Interest for Delays Attributable to Plaintiffs.

## BACKGROUND

      Because the parties are familiar with the facts underlying this action, the Court sets out

only the facts that are relevant to the pending Motions.

      Until September 30, 2011, Defendant Jack in the Box, Inc., owned and operated several

restaurants in Oregon. After September 30, 2011, Defendant did not own or operate any

restaurants in Oregon and did not have any Oregon employees.

      Plaintiffs were employed by Defendant in its Oregon restaurants at various times.

Plaintiffs received their final paychecks from Defendant on the following dates:

| | |
|---|---|
| Tricia Tetrault: | July 11, 2008 |
| Ashley Ortiz: | December 26, 2008 |
| Nicole Gessele: | March 20, 2009 |
| Jessica Gessele: | November 23, 2009 |

2 - OPINION & ORDER

Christina Mauldin:  March 30, 2010.

On August 13, 2010, Jessica Gessele, Ashley Ortiz, Nicole Gessele, and Tricia Tetrault filed a putative class-action Complaint in this Court against Defendant Jack in the Box (*Gessele I*, Case No. 3:10- CV-00960-BR)[1] for violation of the minimum-wage and overtime provisions of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq*., and various Oregon wage-and-hour laws.

On May 16, 2011, Plaintiffs filed a First Amended Complaint in *Gessele I* in which they added Christina Mauldin as a named Plaintiff.

After resolving various motions, United State District Court Judge Anna Brown entered a Judgment on May 15, 2014, dismissing *Gessele I* without prejudice.

On June 10, 2014, Jessica Gessele, Ashley Ortiz, Nicole Gessele, Tricia Tetrault, and Christina Mauldin, filed a putative class action against Jack in the Box in Multnomah County Circuit Court (*Gessele II*) in which they alleged claims for violation of Oregon's wage-and-hour laws, breach of fiduciary duty, and equitable and quasi-contractual claims for return of money.[2]

On July 9, 2014, Defendant removed *Gessele II* to this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2).

On March 2, 2017, Plaintiffs filed a Motion for Rule 23(b)(3) Class Certification.

On June 12, 2017, Judge Brown issued an Opinion and Order in which she granted Plaintiffs' Motions to Certify the Workers Benefit Fund (WBF) Class, to Certify the Shoe Class,

---

[1] In *Gessele I* Ashley Ortiz proceeded as Ashley Gessele and Christina Mauldin proceeded as Christina Luchau.

[2] Plaintiffs also asserted claims under the FLSA, but those were dismissed by Judge Brown before class certification.

3 - OPINION & ORDER

and to Certify the Franchise Transfer Class, and denied Plaintiffs' Motion to Certify the Unpaid Break Class.

On November 13, 2019, Judge Brown granted in part and denied in part the parties' Cross-Motions for Summary Judgment. Relevant to the pending Motions, Judge Brown concluded Defendant's over-withholding of Plaintiffs' WBF assessments was willful within the meaning of Oregon Revised Statute § 652.150.

The matter was transferred to this Court on January 21, 2021.

On August 21, 2021, Defendant requested permission to file a motion for reconsideration of Judge Brown's summary-judgment willfulness finding related to Plaintiffs' WBF claim. The Court denied Defendant permission to file a motion for reconsideration of that issue.

On October 3, 2022, the Court held a pretrial conference at which it, among other things, decertified the shoe-deduction class.

This matter was tried to a jury beginning October 17, 2022. On October 24, 2022, the jury entered a Verdict in which it found, in pertinent part, that some WBF class members were not paid minimum wages, not paid sufficient overtime, and/or received late payment of final wages due to WBF over-withholding, that class members proved $5,307,589.60 in penalty wages for the WBF class claim, that Defendant established each named Plaintiff authorized her shoe deductions in writing, that named Plaintiffs were not entitled to statutory damages for shoe deductions, and that named Plaintiffs proved they were entitled to certain penalty wages for failure to pay minimum wages, overtime, or final wages on termination due to an improper shoe deduction and/or WBF deduction.

On November 21, 2022, Defendant filed a Motion to Correct Verdict. On January 23,

Defendant filed a Motion to Reduce Unconstitutionally Excessive Damage Awards and a Motion to Limit Prejudgment Interest for Delays Attributable to Plaintiffs. The Court took those Motions under advisement on January 4, 2023.

### DEFENDANT'S MOTION TO CORRECT VERDICT

Defendant moves to correct the Verdict pursuant to Federal Rule of Civil Procedure 49(a) or (b)[3] regarding any penalty wages awarded for Jason Diaz and for shoe deductions to the named Plaintiffs. Defendant asserts there is no basis for any penalty wages attributable to Diaz to be part of the Verdict because he settled his claims and is not a class member. Defendant also asserts there no basis for the named Plaintiffs to be awarded penalty wages arising out of shoe deductions because the jury found that all named Plaintiffs authorized the shoe deductions in writing and, therefore, the shoe deductions did not violate the law.

### I.    Standard

Federal Rule of Civil Procedure 49 provides:

(a)    Special Verdict.

(1)    In General. The court may require a jury to return only a special verdict in the form of a special written finding on each issue of fact.

* * *

(b)    General Verdict with Answers to Written Questions.

(1)    In General. The court may submit to the jury forms for a general verdict, together with written questions on one or more issues of fact that the jury must decide. The court must give the instructions and explanations necessary to enable the jury to render a general

---

[3] Plaintiffs do not address whether Rule 49(a) or (b) applies to the Verdict in this case.

verdict and answer the questions in writing, and must direct the jury to do both.

\* \* \*

(3)    Answers Inconsistent with the Verdict. When the answers are consistent with each other but one or more is inconsistent with the general verdict, the court may:

(A)    approve, for entry under Rule 58, an appropriate judgment according to the answers, notwithstanding the general verdict.

"Special verdicts and general verdicts with special interrogatories both consist of a list of questions calling for the jury to make findings of fact." *Embroidery Indus., Inc. v. Brasking, Inc.*, 60 F. App'x 111, 114–15 (9th Cir. 2003)(citing *Floyd v. Laws*, 929 F.2d 1390, 1395 (9th Cir. 1991)(citations omitted)). "As a practical matter . . . the form of a general verdict with interrogatories is [often] virtually indistinguishable from that of a special verdict." *Floyd*, 929 F. 2d at 1395. However, "[j]uries rendering general verdict[s] face a dual task. First, they are responsible for finding facts, which are reflected in their answers to special interrogatories. Second, they must reach a general verdict by applying the law to their findings." *Id.* "[S]pecial verdicts compel the jury to focus exclusively on its fact-finding role . . . [and] empower the judge to play a more prominent role by applying the law to the jury's findings of fact," which "permits the judge to give a minimum of legal instruction to the jurors." *Id.*

Here the jury was asked to both find facts by a preponderance of the evidence and to apply those facts to the law. In addition, the Court provided substantial legal instruction to enable the jury to complete both tasks. Accordingly, the Court concludes the Verdict here was a general

verdict pursuant to Rule 49(b) and, therefore, will apply that Rule in deciding Defendant's Motion to Correct the Verdict.

## II.    Jason Diaz

Plaintiffs agree that counsel inadvertently showed the jury a document that included WBF class penalty wages for Diaz and asked the jury to award an amount that included those penalty wages for Diaz. Plaintiffs concede Diaz settled this matter and the amount of WBF penalty wages should not have included penalty wages for Diaz. Plaintiffs, therefore, agree the amount of minimum-wage penalty wages for the WBF class should be $2,690,544 rather than the $2,692,542 awarded by the jury.

Accordingly, the Court grants Defendant's Motion to Correct Verdict to the extent that the Court reduces the award of WBF class minimum-wage penalty wages by $1,908 to $2,690,544.

## III.    Named Plaintiffs

Defendant asserts the jury's award of penalty wages for the named Plaintiffs improperly included penalty wages for minimum-wage, overtime, and late pay violations arising out of shoe deductions. Defendant contends the jury found that all of the named Plaintiffs authorized the shoe deductions in writing and, therefore, penalty wages attributable to shoe deductions "have no legal basis." Def.'s Mot. at 4. Accordingly, Defendant asks the Court to correct the Verdict to remove the penalty wages attributable to the shoe deductions from the named Plaintiffs.

**A.    Facts**

The jury was instructed that the named Plaintiffs brought claims to recover

statutory damages for payroll deductions made in connection with their purchase of slip resistant

shoes. The Court instructed the jury as follows regarding shoe deductions:

> Under Oregon law, a payroll deduction for the purchase of shoes is permissible when the deduction was authorized in writing by the employee.
>
> Each Plaintiff must prove by a preponderance of the evidence that Defendant made deductions from her wages for shoe purchases on or after August 13, 2004 and on or before September 30, 2011.
>
> Defendant asserts the deductions were permissible because each Plaintiff authorized the deductions in writing. Defendant bears the burden to prove by a preponderance of the evidence that the named Plaintiffs provided written authorization for each shoe deduction.
>
> To the extent Defendant fails to establish each Plaintiff authorized each shoe deduction in writing, that Plaintiff is entitled to statutory damages, which I will explain.

Jury Inst. 22. ECF 382. The Court also instructed the jury regarding statutory damages pursuant

to Oregon Revised Statute § 652.615: "For each individual Plaintiff who had a shoe deduction

that was not authorized in writing ("improper shoe deduction") taken between August 13, 2004

and September 30, 2011, you must determine damages. The measure of damages for each

Plaintiff is $200 or the aggregate amount of shoe deductions, whichever is more." Jury Inst. 24.

The jury was instructed regarding penalty wages for shoe deductions pursuant to § 652.150 as

follows:

> Each Plaintiff seeks penalty wages for improper shoe deductions that caused her to be paid below minimum wage on or after July 14, 2007. An improper shoe deduction caused a Plaintiff to be paid below minimum wage if it caused the Plaintiff to be paid less than Oregon's minimum

> wage rate in any workweek on or after July 14, 2007. . . . Plaintiffs have the burden to prove by a preponderance of the evidence whether an improper shoe deduction caused the Plaintiff to be paid below minimum wage on or after July 14, 2007.

Jury Inst. 25. Similarly, the Court instructed the jury:

> An improper shoe deduction caused a named Plaintiff to be paid insufficient overtime if the Plaintiff was paid less than 1.5 times that Plaintiff's regular hourly rate for any hours worked in excess of 40 during any given workweek on or after July 14, 2008.
>
> Plaintiffs have the burden to prove by a preponderance of the evidence whether an improper shoe deduction caused the Plaintiff to be paid insufficient overtime on or after July 14, 2008.

Jury Inst. 26. The Verdict Form asked in relevant part: "Did Defendant prove the individual Plaintiff authorized her shoe deductions in writing?" and listed each named Plaintiff next to spaces stating "yes" and "no." The jury was directed that if it found Defendant proved that all of the named Plaintiffs authorized the shoe deductions in writing it should skip the question asking for the "amount of statutory damages, if any to be awarded to each Plaintiff who Defendant did not establish authorized her shoe deductions in writing." The Verdict Form then asked:  "Do you find Plaintiff was not paid minimum wages, not paid sufficient overtime, and/or received late payment of final wages due to an improper shoe deduction and/or a WBF violation?" and listed each named Plaintiff next to spaces stating "yes" and "no." Finally, the jury was asked to "[s]pecify the penalty wages, if any, for each Plaintiff who has proved she was not paid minimum wage, not paid sufficient overtime, or not paid final was on termination due to an improper shoe deduction and/or a WBF violation" and each named Plaintiff was listed.

     The jury found Defendant proved each of the named Plaintiffs authorized their shoe deductions in writing. The jury answered the question regarding statutory damages for

9 - OPINION & ORDER

improper shoe deductions and indicated "0" statutory damages should be awarded to each named Plaintiff for shoe deductions. The jury, however, answered "yes" to each named Plaintiff in response to the question "Do you find Plaintiff was not paid minimum wages, not paid sufficient overtime, and/or received late payment of final wages due to an improper shoe deduction and/or a WBF violation?" The jury then specified the penalty wages for each named Plaintiff "who has proved she was not paid minimum wage, not paid sufficient overtime, or not paid final was on termination due to an improper shoe deduction and/or a WBF violation" as follows: Jessica Gessele $4,740; Ashley Ortiz $3,880.80; Nicole Gessele $4,752; and Christina Mauldin[4] $5,760.[5]

After the Court received the Verdict, defense counsel asserted the jury's findings regarding the amount of penalty wages due to a failure to pay minimum wage, overtime or late final pay should be reduced due to the jury's finding that no named Plaintiff had an improper shoe deduction. Plaintiffs' counsel disagreed, but the parties agreed the matter should be decided by the Court in post-trial motions.

### B.    Analysis

At trial, Plaintiffs' witness, Jennifer Murphy, testified that she calculated the named Plaintiffs' penalty wages as follows: $1,896 for minimum wage violations; $9,520.80 for overtime violations; and $9,696 for late pay violations, totaling $21,112.80 in penalty wages for the named Plaintiffs. Maher Decl. ¶ 2, Ex. 1 (trial transcript) at 18. Murphy set out penalty wages

---

[4] By the time of trial Christina Mauldin was proceeding as Christina Peacock. The Court refers to her as Christina Mauldin in this Opinion and Order to avoid confusion.

[5] Penalty wages awarded to Tricia Tetrault on her individual claims are not at issue in this Motion.

for the relevant named Plaintiffs as follows: $4,740 for Jessica Gessele; $3,880.80 for Ashley Ortiz; $4,752 for Nicole Gessele; and $5,760 for Christina Peacock. Maher Decl. ¶ 3, Ex. 2 (trial transcript) at 644. Murphy testified that she calculated these amounts by awarding penalty wages for both WBF over-withholding and shoe deductions and by first awarding for a minimum wage violation if applicable, then an overtime violation if applicable, and then late final pay if applicable. Maher Decl. ¶ 2, Ex. 1 at 45, Ex. 2 at 31-33. Plaintiffs' counsel asserted in closing argument that the jury should award the penalty wages to named Plaintiffs in the amounts testified to by Murphy and the jury did so.

Defendant asserts the amount of penalty wages awarded by the jury to named Plaintiffs does not conform to the evidence and requests the Court to reduce the amount of penalty wages awarded to named Plaintiffs to account for the jury's finding that Defendant did not take improper shoe deductions. Specifically, Defendant asserts the jury found Defendant did not take any improper shoe deductions from named Plaintiffs' wages and, therefore, pursuant to the Court's instructions and the Verdict Form, the jury did not intend to award penalty wages arising out of improper shoe deductions. Defendant notes based on Murphy's stated methodology and the chart shown to the jury, that $1,896 of the penalty wages that Murphy calculated for Ashley Ortiz are solely attributable to shoe deductions because that is the only deduction Murphy attributed to a minimum wage violation for Ashley Ortiz. Maher Decl. ¶ 4, Ex. 3. Similarly, for Jessica Gessele, $2,460.00 in penalty wages that Murphy attributed to late final pay are based solely on shoe deductions because Jessica Gessele had no minimum wage violations, and her overtime violations were due to WBF over-withholding. Maher Decl. ¶ 4, Ex. 3. Murphy calculated two sets of penalty wages for Nicole Gessele each in the amount of $2,376

attributed to WBF over-withholding and shoe deductions. Maher Decl. ¶ 4, Ex. 3. Similarly,

Murphy calculated two sets of penalty wages for Christina Mauldin each in the amount of $2,880

attributed to WBF over-withholding and shoe deductions. Maher Decl. ¶ 4, Ex. 3. According to

Defendant, therefore, the Court should correct the Verdict to conform to the evidence and reduce

the penalty wages awarded to Ashley Ortiz to $1,984.80; reduce penalty wages awarded to

Jessica Gessele to $2,280; reduce the penalty wages awarded to Nicole Gessele to $2,376; and

reduce the penalty wages awarded to Christina Mauldin to $2,880 for a total award of penalty

wages for named Plaintiffs of $11,500.80.[6]

        The jury was instructed that under the circumstances of this case an improper

shoe deduction is one that was not authorized in writing; was asked to determine by a

preponderance of the evidence if named Plaintiffs had authorized their shoe deductions in

writing; and was instructed that it could award penalty wages to named Plaintiffs for minimum

wage, overtime, or late pay violations only if they were caused by a WBF or improper shoe

deduction. As noted, the jury found there were no improper shoe deductions and, therefore, to

the extent that their factual findings regarding penalty wages for minimum wage, overtime, or

late pay violations included penalty wages for violations arising out of improper shoe deductions,

they are inconsistent with the evidence and the general Verdict. The Court, therefore, grants

Defendant's Motion to Correct the Verdict pursuant to Rule 49(b) and amends the Verdict to

conform the jury's answers regarding penalty wages to its answer to the special interrogatories.

Accordingly, the Court amends the Verdict to award named Plaintiffs' $11,500.80 in penalty

---

[6] Opinion and Order, Ex. 1.

wages for violations caused by WBF over-withholding as set out in Exhibit 1 to this Opinion and Order.

**DEFENDANT'S MOTION TO REDUCE UNCONSTITUTIONALLY EXCESSIVE DAMAGE AWARDS**

Defendant requests the Court reduce the penalty wages awarded to the WBF class on the basis that the penalty-wage amount violates constitutional due process because it is "so severe and oppressive as to be wholly disproportionate to the offense and obviously unreasonable." *Wakefield v. ViSalus, Inc.*, 51 F.4th 1109, 1120 (9th Cir. 2022). Plaintiffs oppose Defendant's Motion.

## I.    Facts

The WBF is a program authorized by Oregon Revised Statute § 656.506 that provides various benefits to workers injured on the job in Oregon. Every year the State of Oregon publishes a WBF assessment rate and mails the information about the rate and a written notice to all employers registered with the Oregon Secretary of State. Pursuant to Or. Rev. Stat. § 656.506(2) and (3) employers are required to pay at least 50% of the WBF assessment rate set by the State and permitted to withhold only the remaining percentage from employees. For example, in 2003 the WBF assessment rate was 3.6¢ per hour. Employers, therefore, were required to pay to the WBF at least 1.8¢ for every hour that each of their employees worked during 2003. Although employers were permitted to pay more than 1.8¢, per hour they were not permitted to withhold from their employees' paychecks more than 1.8¢ for each hour that their employees worked during 2003.

The record at summary judgment reflected Oregon mailed the annual WBF

assessment-rate notices to Defendant and it received the notices. The record also reflected Defendant paid the correct total amount of WBF assessments to the State every year during the relevant period. Defendant, however, over-withheld WBF assessments from Plaintiffs during the class period. Specifically, Defendant over-withheld between .1¢ and .4¢ per hour in WBF benefits from the wages of nearly 5,000 employees over the six-year limitations period for a total of $21,945.29 in WBF over-withholding.[7] At summary judgment Defendant conceded that its over-withholding of WBF assessments from its Oregon employees was a wrongful deduction in violation of Oregon Revised Statutes § 652.610(3). Accordingly, Judge Brown concluded at summary judgment that Defendant violated § 652.610(3) when it improperly over-withheld WBF funds from Plaintiffs throughout the class period. Defendant concedes that pursuant to Oregon Revised Statute § 652.615 the WBF class is entitled to an award of $993,400[8] in statutory damages for the over-withholding of WBF benefits in violation of § 652.610(3).

Defendant asserted at summary judgment that the over-withholding of WBF benefits was not willful within the meaning of Or. Rev. Stat. § 652.150 because it was the result of a payroll software issue and, therefore, an unintentional miscalculation. Specifically, when Defendant's payroll software was initially programmed and put in place in 2003, the WBF assessment rate for employees was properly calculated. Beginning in 2004, however, when the State decreased the WBF assessment rate, the employee portion of the assessment remained fixed at the 2003 rate in Defendant's computer system causing Defendant's portion of the

---

[7] $13,468.37 of the $21,945.29 was over withheld during the three-year limitations period applicable to claims under Or. Rev. Stat. § 652.150 for penalty wages.

[8] The amount is calculated as $200 for each of the 4,967 who had WBF over-withholding during the class period.

assessment to decrease. As a result, Defendant paid less than 50% of the WBF assessment rate and its employees paid more than 50%. The record at summary judgment reflected Defendant was aware of Oregon's annual changes in the overall WBF assessment rate and that Defendant's corporate agents entered the changed overall WBF assessment rate in Defendant's computer system. Judge Brown, therefore, found Defendant's failure to adjust the employees' assessment rate was not an unintentional miscalculation. Judge Brown concluded "[r]egardless whether Defendant failed to review the employee withholding rate during the relevant period or whether Defendant was unaware of its legal requirement not to withhold more of the WBF assessment from employees than from itself, Defendant's failure makes Defendant the kind of 'careless employer' the *Sabin* court concluded willfully violated Oregon's wage-and-hour laws." Opinion and Order [217] at 55 (citing *Sabin v. Willamette–Western Corp.,* 276 Or. 1083, 1093 (1976); *Elonis v. U.S.*, 135 S. Ct. 2001, 2009 (2015)("The familiar maxim ignorance of the law is no excuse typically holds true. Instead, . . . a defendant generally must know the facts that make his conduct fit the definition of the offense even if he does not know that those facts give rise to [an offense].")(quotation omitted)). Judge Brown concluded Defendant's over-withholding of WBF benefits was willful within the meaning of Or. Rev. Stat. § 652.150 and, therefore, Plaintiffs were entitled to penalty wages pursuant to § 652.150 for the over-withholding.

Ultimately the jury found WBF class members established that Defendant's over-withholding of WBF benefits caused class members not to be paid minimum wages or sufficient overtime or not to receive all of the wages due in their final paycheck. The jury identified the amount of penalty wages for WBF over-withholding that caused class members not to receive minimum wage to be $2,692,452; that caused class members not to receive sufficient overtime to

be $909,368.80; and that caused class members not to receive all of their wages in their final

paychecks to be $1,705,768.80, for a total of penalty wages for over-withholding of WBF

benefits of $5,307,589.60 for the class.

## II.        Penalty Wages and Due Process

Plaintiffs are entitled to penalty wages for Defendant's over-withholding of WBF

benefits pursuant to Or. Rev. Stat. § 652.150(1), which provides in pertinent part:

> if an employer willfully fails to pay any wages or compensation of any employee
> whose employment ceases . . . then, as a penalty for the nonpayment, the wages or
> compensation of the employee shall continue from the due date thereof at the
> same hourly rate for eight hours per day until paid or until action therefor is
> commenced. However . . . [i]n no case shall the penalty wages or compensation
> continue for more than 30 days from the due date.

The Oregon Supreme Court evaluated the constitutionality of § 652.150 in *State ex rel Nilsen v.*

*Johnston,* 233 Or. 103 (1962). The Court noted the purpose of § 652.150 is "to protect

employees from unscrupulous or careless employers who fail to compensate their employees

although they are fully aware of their obligation to do so" and that § 652.150 "operates only

where the employer has 'wilfully' failed to meet [its] obligations" under Oregon's wage-and-

hour laws. *Id*. at 108. The Court rejected the defendants' argument that § 652.150 violated the

due process clause of the United States Constitution because "application of the penalty results in

an arbitrary and unreasonable confiscation of property" pointing out that the defendants "proceed

on the assumption that the employer who is being penalized is ignorant of the fact that he is

indebted to his former employee. We have already shown that this assumption is erroneous and

. . . the statute penalizes only employers who do not pay even though they know . . .

compensation is due." *Id.*at 109. The Court also found without merit the defendants' argument

16 - OPINION & ORDER

that the "amount of the penalty is arbitrary and unreasonable in that it has no relationship to the employee's loss" because the Court was "unable to discover any evidence in the record which supports [that] contention." *Id.* Accordingly, the Court concluded § 652.150 is constitutional on its face and as applied under the circumstances of *Johnston*. Oregon courts, however, have not addressed whether aggregated penalty wages awarded pursuant to § 652.150 in a class action can violate the due process clause of the United States Constitution.

In *St. Louis I.M. & S. Railway Company v. Williams*, 251 U.S. 63 (1919), the United States Supreme Court evaluated the constitutionality of a statutory penalty that greatly exceeded the damages amount for the violation. In that case, an Arkansas statute regulated rates for the transportation of passengers between points within the state and provided that any railroad company that "demand[ed] or collect[ed] a greater compensation than the statute prescribe[ed] [was] subject 'for every such offense' to a penalty of 'not less than fifty dollars nor more than three hundred dollars.'" *Id.* at 64. The defendant railroad company, which was subject to the statute, "demanded and collected 66 cents more than the prescribed fare from each of two sisters carried over part of its line." *Id.* The sisters brought two actions against the defendant, and each obtained a judgment against the defendant for, among other things, the overcharge of 66¢ and a penalty of $75. *Id.* The defendant appealed[9] and asserted the penalty provision of the statute violated the due process clause of the United States Constitution because it was "arbitrary and unreasonable, and not proportionate to the actual damages sustained." *Id.* The Supreme Court noted "the power of the state to impose fines and penalties for a violation of its statutory

---

[9] The actions were consolidated for appeal.

requirements is coeval with government." *Id*. at 66 (quotation omitted). In addition, the fact that

the penalty is "giv[en] . . . to the aggrieved passenger" rather than to the state did not "require

that it be confined or proportioned to his loss or damages; for, as it is imposed as a punishment

for the violation of a public law, the Legislature may adjust its amount to the public wrong rather

than the private injury, just as if it were going to the state." *Id*. Thus, although the due process

clause "places a limitation upon the power of the states to prescribe penalties for violations of

their laws," that limitation includes "the express or tacit qualification that the states still possess a

wide latitude of discretion in the matter, and that their enactments transcend the limitation only

where the penalty prescribed is so severe and oppressive as to be wholly disproportioned to the

offense and obviously unreasonable." *Id*. at 66-67. The Court noted that the Arkansas Supreme

Court explained the need for penalty at issue in the Arkansas statute as follows:

> 'It is commonly known that carriers are not prone to adhere uniformly to rates
> lawfully prescribed and it is necessary that deviation from such rates be
> discouraged and prohibited by adequate liabilities and penalties, and we regard
> the penalties prescribed as no more than reasonable and adequate to accomplish
> the purpose of the law and remedy the evil intended to be reached.'

*Id*. at 67 (quoting *Chicago, Rock Island & Pacific Ry. Co. v. Davis*, 114 Ark. 519, 525 (1914)).

The Supreme Court concluded the penalty did not violate the due process clause even though it

was more than 113 times greater than the damages suffered by the plaintiffs because the validity

of a statutory penalty "is not to be tested in that way." *Williams*, 251 U.S. at 67. Rather

> [w]hen [the statutory penalty] is considered with due regard for the interests of the
> public, the numberless opportunities for committing the offense, and the need for
> securing uniform adherence to established passenger rates, . . . it . . . cannot be
> said to be so severe and oppressive as to be wholly disproportioned to the offense
> or obviously unreasonable.

*Id*.

18 - OPINION & ORDER

In *United States v. Citrin*, 972 F.2d 1044 (9th Cir. 1992), the Ninth Circuit considered *Williams* in the context of an action for violation of the National Health Service Corps ("NHSC") Scholarship Program. In that case the defendant received an NHSC scholarship for medical school, but failed to complete either the required deferral materials or medical service in an underserved area. The government, therefore, brought an action against the defendant for payment of damages at the statutorily prescribed amount of "treble the scholarship" and "treble the interest rate." *Id.* at 1048. The district court granted the government's requested damages and interest and issued a judgment for $176,026.02. *Id.* The defendant appealed alleging, among other things, that the damages were "so excessive that they violate[d] his due process rights." *Id.* The Ninth Circuit described the damages as a "statutorily prescribed penalty" and noted statutorily prescribed penalties violate "due process rights 'only where the penalty prescribed is so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable.'" *Id.* at 1051 (quoting *Williams*, 251 U.S. at 66-67). The Ninth Circuit considered the factors set out in *Williams* including the public policy underlying the NHSC scholarship program, which was "to address the maldistribution of health care professionals in the United States," and concluded "[g]iven the resources necessary to find a doctor to practice in an underserved area, the damages in this case . . . are not so unreasonable that they violate due process." *Id.* at 1046, 1051.

Taken together, these cases indicate that the constitutionality of a statutorily prescribed penalty is generally not to be evaluated by its ratio to the damages suffered by the plaintiff. Rather, courts should consider factors such as the interests of the public, the opportunities for committing the offense, and the need for securing uniform adherence to rates established by the

19 - OPINION & ORDER

state in determining whether a statutorily prescribed penalty is so unreasonable as to violate due process.

Defendant relies on *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996), and *State Farm Mutual Automobile Insurance Company v. Campbell*, 538 U.S. 408 (2003), to support its argument that the penalty wages in this matter violate due process because they greatly exceed Plaintiffs' actual damages. In *Wakefield,* however, the Ninth Circuit explicitly declined to apply the tests set out by the Supreme Court in *Gore* and *State Farm* both specifically in that case and generally "outside the context of jury's award of punitive damages." 51 F.4th at 1122.

Although *Wakefield* involved an award of statutory damages rather than a statutory penalty,[10] it provides some guidance on assessing the constitutionality of a damages award prescribed by statute in the context of a class-action case. In *Wakefield* the plaintiff filed a class action for violation of the Telephone Consumer Protection Act ("TCPA"). The jury found the defendant sent 1,850,440 prerecorded calls to class members in violation of the TCPA and, because the TCPA sets minimum statutory damages at $500 per call,[11] awarded statutory damages of $925,220,222. The defendant filed a post-trial motion challenging the statutory damages award as "unconstitutionally excessive." 51 F.4th at 1113. The district court denied the motion noting "it was within Congress's discretion to fix damages for a violation of the TCPA at

---

[10] The trial court specifically declined to award statutory penalty damages based on its finding that the defendant did not willfully or knowingly violate the statute. *Wakefield v. Visalus*, Case No. 3:15-cv-01857-SI, ECF 326.

[11] The TCPA provides: "A person or entity may . . . bring . . . an action to recover for actual monetary loss from such a violation, or to receive $500 in damages for each such violation, whichever is greater. 47 U.S.C.A. § 227(b)(3)(B).

$500 and that due process did not require the court to consider the constitutionality of the statutory damages award in the aggregate." *Id.* at 1117. The defendant appealed. On appeal the Ninth Circuit noted "[j]uries and legislatures enjoy broad discretion in awarding damages," but that discretion is constrained by the due process clause. *Id.* at 1120. The court noted that "[i]n recent years, numerous cases have outlined criteria for evaluating when punitive damages awarded by a jury exceed constitutional limitations," but "[h]ow the Constitution limits the award of statutory damages is less developed." *Id.* "[C]onstitutional due process concerns are heightened [when] . . . statutory damages are awarded as a matter of strict liability [because] plaintiffs are unable to quantify any actual damages they have suffered from receiving the robocalls." *Id.* In those circumstances courts "must evaluate an award of statutory damages 'with due regard for the interests of the public, the numberless opportunities for committing the offense, and the need for securing uniform adherence' to the statute." *Id.* (quoting *Williams*, 251 U.S. at 67). The court noted that although it has "recognized the application of *Williams* to statutory awards on a per-violation basis," it has "grappled with the constitutionality of statutory damages awards challenged in the aggregate whe[n] the award is unusually high because of either the large number of violations at issue in a single dispute or . . . the aggregation of damages in class action litigation." *Id.* at 1121 (citations omitted). Ultimately the Ninth Circuit concluded that even though *Williams* did not address an aggregated damages award, the constitutional due-process test set out in that case applied because *Williams* "did not turn on the amount of the per-violation penalty," rather the Court "evaluated the importance of the proscribed conduct . . . and the likelihood of violations." *Id.* at 1122.

The Ninth Circuit also noted its decision in *Six (6) Mexican Workers v. Arizona Citrus*

*Growers,* 904 F.2d 1301 (9th Cir. 1990), "provides further guidance for determining whether a particular statutory damages award is disproportionately punitive in the aggregate." *Id.*at 1123. In that case the Ninth Circuit "reviewed an aggregated damages award in a class action lawsuit for violations of the Farm Labor Contractor Registration Act ('FLCRA')." *Id.* at 1122. The court found "the individual awards exceeded both 'what was necessary to compensate any potential injury from the violations' and the awards, in the aggregate, exceeded 'that necessary to enforce the Act or deter future violations.'" *Wakefield*, 51 F.4th at 1122 (quoting *Six Mexican Workers,* 904 F.2d at 1309). The court noted *Six Mexican Workers* "addressed a somewhat different issue than the one [in *Wakefield*]: the case dealt with the reduction of damages per violation to an amount within a statutorily defined range [and] [t]he FLCRA . . . did not contemplate punitive penalties in the calculation of liquidated damages." *Wakefield*, 51 F.4th at 1123 (citations omitted). Nevertheless, the court found *Six Mexican Workers* "points courts to factors to help assess proportionality and reasonableness and so can guide trial courts in determining when an award is *extremely* disproportionate to the offense and 'obviously' unreasonable." *Id.* (quoting *Williams*, 251 U.S. at 67)(emphasis in *Wakefield*). The factors include: "1) the amount of award to each plaintiff, 2) the total award, 3) the nature and persistence of the violations, 4) the extent of the defendant's culpability, 5) damage awards in similar cases, 6) the substantive or technical nature of the violations, and 7) the circumstances of each case." *Six Mexican Workers*, 904 F.2d at 1309 (quotation omitted).

The Ninth Circuit concluded in *Wakefield* that "evaluation of an award's relationship to the offense requires consideration of the statute's public importance and deterrence goals" as well as the *Six Mexican Workers* factors. 51 F.4th at 1122. The court noted "the goals of a statute

in imposing a per-violation award may become unduly punitive when aggregated," but stressed that "only very rarely will an aggregated statutory damages award meet the exacting *Williams* standard and exceed constitutional limitations [when] the per-violation amount does not" recognizing that "[l]egislatures are empowered to prescribe purely punitive penalties for violations of statutes." *Id.* at 1123. The Ninth Circuit cautioned that reducing aggregated statutory damages awards without satisfying the *Williams* criteria would "overstep the role of the judiciary and usurp the power of the legislature" and noted it was "constrained . . . [to] interpret statutes with awareness that Congress could have enacted limits as to damages, including in large class action litigation, provided discretion to courts to award damages within a given range, or limited liability in any number of ways." *Id.* at 1124. Thus, "because the appropriate penalty for statutory violations is a legislative decision best left to Congress, courts should disregard the plain statutory language directing damages and allowing class action and other aggregations only in the most egregious of circumstances." *Id.* Ultimately, the *Wakefield* court did not conclude the award of $925,220,000 was constitutionally excessive, rather it reversed and remanded the matter to the trial court to apply the *Williams* test as well as factors set out in *Six Mexican Workers* and to assess whether the award was "so severe and oppressive that it violates . . . due process." *Id.* at 1125.

In summary although the aggregate award to which Defendant objects in this matter is one of penalty wages rather than statutory damages, the Court believes the Ninth Circuit would approve the application of tests out in *Williams* and *Six Mexican Workers* to evaluate the constitutionality of the award of penalty wages in this case.

23 - OPINION & ORDER

**III.**        **Analysis**

    **A.**        ***Williams* Factors**

        As noted, the factors the Supreme Court set out in *Williams* are the interests of the public, the opportunities for committing the offense, and the need for securing uniform adherence to the statute.

        **1.**        **Public Interest**

> It is the public policy of this state that no person shall be hired, nor permitted to work for wages, under any conditions or terms, for longer hours or days of service than is consistent with the person's health and physical well-being and ability to promote the general welfare by the person's increasing usefulness as a healthy and intelligent citizen.

Or. Rev. Stat. § 652.010(1). Oregon Revised Statute § 653.015 "declare[s] [it] to be the policy of the State of Oregon to establish minimum wage standards for workers at levels consistent with their health, efficiency and general well-being." "Oregon has expressed in its wage-and-hour laws a strong public policy interest in the full and timely payment of employee wages generally and upon termination." *Schedler v. FieldTurf USA, Inc.*, No. 3:16-CV-0344-PK, 2017 WL 3412205, at *3 (D. Or. Aug. 9, 2017). "Oregon's wage and hour statutes were enacted to protect wage earners from employers who might use their positions of economic superiority to hinder the payment of such wages, [therefore,] those statutes represent sound public policy geared toward remediating inequities arising from that power disparity." *Jones v. Four Corners Rod & Gun Club*, 366 Or. 100, 132–33 (2020)(dissent). The importance of Oregon's public policy to protect wage earners is indicated by the legislature's decision to mandate the penalty for unpaid wages set out in § 652.150. As the Court noted in *Johnston,* the purpose of § 652.150 is "to

protect employees from unscrupulous or careless employers who fail to compensate their employees although they are fully aware of their obligation to do so." *Johnston,* 233 Or. at 108. Oregon has further emphasized the importance of the public policy to protect wage earners by the fact that the Commissioner of the Oregon Bureau of Labor and Industries ("BOLI") may assess civil penalties for employers who violate Oregon's wage-and-hour laws. *See, e.g.,* Or. Rev. Stat. § 652.900(1)("In addition to any other penalty provided by law, the Commissioner of [BOLI]  may assess a civil penalty not to exceed $1,000 against any person who violates ORS 652.020, 652.110, 652.140, 652.145, 652.260, 652.610 (4) or 652.750 or any rule adopted under those statutes."

 The California Supreme Court noted in construing California's Labor Code §§ 201 through 203, which served as the model for Or. Rev. Stat. § 652.150:

> The public policy in favor of full and prompt payment of an employee's earned wages is fundamental and well established: Delay of payment or loss of wages results in deprivation of the necessities of life, suffering inability to meet just obligations to others, and, in many cases may make the wage-earner a charge upon the public. . . . It has long been recognized that wages are not ordinary debts, that they may be preferred over other claims, and that, because of the economic position of the average worker and, in particular, his dependence on wages for the necessities of life for himself and his family, it is essential to the public welfare that he receive his pay when it is due. An employer who knows that wages are due, has ability to pay them, and still refuses to pay them, acts against good morals and fair dealing, and necessarily intentionally does an act which prejudices the rights of his employee. *See Gould v. Maryland Sound Industries, Inc.*, 31 Cal.App.4th 1137, 1147 (1995)(statute criminalizing prompt payment violations shows "the policy involves a broad public interest, not merely the interest of the employee."). . . . [S]ections 201 and 203 . . . implement[] this fundamental public policy regarding prompt wage payment.

*Smith v. Superior Ct.*, 39 Cal. 4th 77, 82 (2006)(citations and quotations omitted). Oregon, like

California, has criminalized violations of Oregon's wage-and-hour laws. *See, e.g.,* Or. Rev. Stat. § 652.990(8)("Violation of ORS 652.610 or 652.620 is a Class D violation"); Or. Rev. Stat. § 653.991 ("Violation of any provision of this section or ORS 653.010 to 653.565 or of any rule adopted by [BOLI] under ORS 653.307 is . . . a [Class A] misdemeanor" punishable by up to a year in jail and/or a fine of up to $6,250). This indicates "the policy involves a broad public interest, not merely the interest of the employee." *Gould*, 31 Cal. App.4th at 1147.

In summary, Oregon's wage-and-hour laws are based on strong public policies to protect the full and timely payment of wages, to protect wage earners from employers who might use their positions of economic superiority to hinder the payment of such wages, and to remediate inequities arising from that power disparity. The public policies underlying Oregon's wage-and-hour laws are of fundamental importance to individual employees and to the public welfare because the delay or nonpayment of wages results in deprivation of the necessities of life, including the inability to meet just obligations to others. The Court, therefore, finds this factor does not favor reducing the penalty-wage award.

## 2.    Opportunities for Committing the Offense

In *Williams* the Court considered the fact that the defendant had "numberless opportunities for committing the offense" because individuals rode the defendant's railway line regularly. Plaintiffs here note Defendant's failure to adjust its computer program for employees' WBF withholding led to Defendant improperly over-withholding WBF contributions from every paycheck of every Oregon employee of Defendant for nearly ten years. Plaintiffs assert "there could hardly be a wage and hour issue that provides for more 'numberless opportunities' than a deduction that applies to every single hour worked by every employee in

26 - OPINION & ORDER

Oregon." Pls. Resp. at 9.

Defendant points out that after it discovered the over-withholding in a February 2012 deposition, it corrected the error. The Court notes, however, that Defendant sold its last Oregon stores on September 30, 2011, and, therefore, by February 2012 it no longer had Oregon employees. During the period relevant to this action and within the penalty-wage limitation period Defendant's ability to commit the offense of over-withholding WBF contributions was limited only by the number of individuals it employed in Oregon. The Court, therefore, finds this factor does not favor reducing the penalty wage award.

### 3.        Need to Secure Uniform Adherence to the Statute

The Court noted in *Williams* that "it is necessary that deviation from [uniform, established passenger rates] be discouraged and prohibited by adequate liabilities and penalties." 251 U.S. at 67. Plaintiffs assert that unless wage-and-hour rules are applied uniformly across all employers, unscrupulous employers could gain a competitive financial advantage over employers who adhere to the law. In addition, failure to uniformly adhere to Oregon's wage-and-hour laws could result in the failure to protect employees from employers who "might use their positions of economic superiority to hinder the payment of such wages." *Jones*, 366 Or. at 133. These results are anathema to the stated public policies and purposes behind Oregon's wage-and-hour laws. The Court concludes it is necessary that deviation from the uniform and established wage-and-hour laws must be discouraged and prohibited. Accordingly, this factor does not favor reducing the penalty wages award.

### B.        *Six Mexican Workers* Factors

As noted, the factors set out by the Ninth Circuit in *Six Mexican Workers* are

(1) the amount of award to each plaintiff, (2) the total award, (3) the nature and persistence of the

violations, (4) the extent of the defendant's culpability, (5) damage awards in similar cases,

(6) the substantive or technical nature of the violations, and (7) the circumstances of each case.

### 1.    Each Class Plaintiff's Award

The amount of penalty wages awarded to each WBF class member

varied due to the differing wage rates of class members as well as nature of the wages that were

unpaid (minimum wages, overtime, or late pay). The record at trial, however, reflects most of the

class members were awarded approximately $2,000 in penalty wages. In *Six Mexican Workers*

the Ninth Circuit found awards to class members that ranged between $400 and $1,600

"exceeded what was necessary to compensate any potential injury" and what is necessary "to

enforce the Act or deter future violations." 904 F.2d at 1309. Plaintiffs here point out, however,

that the Ninth Circuit reduced the total award in *Six Mexican Workers* to an amount that resulted

in an average award of $630 per class member, which, adjusted for inflation, would be $1,472.42

per class member today, a sum more in line with the $2,000 per class member here. Plaintiffs

also note that employees in Oregon routinely obtain penalty wages on an individual basis in the

$2,000 range and those have never been found to be unconstitutionally large. The Court,

therefore, finds this factor does not favor reducing the penalty-wage award.

### 2.    The Total Award

The total WBF class penalty-wage award was $5,307,589.60 due

in large part to the fact that there are nearly 5,000 class members. Although *Six Mexican Workers*

found an award of $1,846,500 for a class of 1,349 members was constitutionally excessive, that

case involved compensatory statutory damages rather than penalty wages. The court in that case,

therefore, did not cite or analyze *Williams* in its decision to reduce the damages. In addition, although the Ninth Circuit in *Wakefield* expressed concern about the possible constitutionality of a statutory damages award of $925,220,222, which is more than 174 times the award in this case, it did not find the award to be unconstitutional. Instead, it remanded the matter to the district court for further consideration in light of the guidance provided by the court. This factor, therefore, does not clearly favor either Defendant or Plaintiffs' position.

### 3. Nature and Persistence of the Violations, the Substantive or Technical Nature of the Violations, and the Extent of Defendant's Culpability

These three factors are intertwined in this case. As noted, the record reflects Defendant over-withheld WBF contributions from every paycheck of every Oregon employee for nearly a decade and corrected its error only after it no longer had any Oregon employees. Although Defendant notes the individual over-withholdings were very small, ranging between .1¢ and .4¢ per hour, that does not excuse the fact that Defendant committed the violation thousands of times as to thousands of employees. These violations were not isolated incidents or the result of a few mangers engaging in violative behavior, but rather the result of a state-wide, company-driven system that persisted from 2004 through 2012.

Defendant also relies on the fact that the over-withholding was due to a computer error. Judge Brown, however, found Defendant's behavior to be willful and not an unintentional miscalculation. Defendant's over-withholding reduced employee's wages and was not merely a technical violation of Oregon's wage-and-hour laws. The Court, therefore, concludes these factors do not favor reducing the penalty-wage award.

####     4.        Damage Awards in Similar Cases

There are few Oregon wage-and-hour class-action cases to which to compare the jury award in this case. Plaintiffs cite *Migis v. Autozone, Inc.*, 282 Or. App. 774 (2016). In that case the plaintiffs filed a class action alleging the defendant failed to pay them for certain time they spent at work doing work-related tasks and failed to timely pay final wages when due in violation of Oregon Revised Statutes §§ 653.055 and 652.140. The plaintiffs also sought penalty wages pursuant to § 652.150. The jury returned a verdict against the defendant as to the off-the-clock and final-wages claims and awarded the plaintiffs actual damages in the amount of $110,030. The trial court then held a bench trial and "determined civil penalties [pursuant to § 652.150] in the amount of $2,439,266." *Id.* at 779. The defendant filed a motion to reduce the penalty wages on the basis that the "penalties exceeded what was permissible under federal due process." *Id.* The trial court denied the motion. The defendant renewed the motion after the trial court entered a judgment and the trial court again denied the motion. The defendant challenged the award of penalty wages on appeal on the basis that the jury was required to make a factual finding of willfulness in order for the court to award penalty wages. The defendant did not, however, challenge the trial court's rulings regarding the constitutionality of the penalty-wage award. The Oregon Court of Appeals reversed on the ground that the trial court erred when it did not require the jury to decide whether the defendant's failure to pay wages was willful before the court assessed penalty wages. Although the Oregon Court of Appeals did not address the constitutionality of the amount of penalty wages, the trial court's rulings indicate an aggregate award of $2,439,266, composed of $2,386.75 per class member, is not unconstitutionally high.

30 - OPINION & ORDER

Plaintiffs also point to *Delgado v. Del Monte Fresh Produce, N.A., Inc.*, 260 Or. App. 480 (2014), in which a class of 306 plaintiffs was awarded penalty wages pursuant to § 652.150 of $720,741.86, or $2,355.36 per class member. Defendant points out that the defendant in that case challenged the award of penalty wages on the grounds that the class should have been decertified and no "joint employer" relationship existed. The defendant did not make a due-process challenge to the amount of the penalty-wage award. The Court agrees that because the due-process issue was not raised, *Delgado* is not a strong comparator case.

Defendant cites *Montera v. Premier Nutrition Corp.*, No. 16-CV-06980-RS, 2022 WL 3348573 (N.D. Cal. Aug. 12, 2022), as a similar case. In that case the plaintiffs brought a class action for violations of New York General Business Law ("GBL") §§ 349 and 350. The jury found the class proved actual damages in the amount of $1,488,078.49. The plaintiffs then brought a motion for entry of judgment seeking statutory damages "in the amount of $50 per unit sold for violations of GBL § 349 and $500 per unit sold for violations of GBL § 350" totaling a statutory damages award of $91,436,950. *Id.*, at *1. The court declined to award statutory damages of $91,436,950 and instead found statutory damages of $8,312,450, which was calculated as $50 per unit sold, to be a more appropriate award. *Id.*, at *6. *Montera*, however, has limited usefulness as comparator case because, unlike Oregon, New York law specifically limits the ability of class-action plaintiffs to obtain statutory damages. N.Y. C.P.L.R. § 901(b)("Unless a statute creating or imposing a penalty, or a minimum measure of recovery specifically authorizes the recovery thereof in a class action, an action to recover a penalty, or minimum measure of recovery created or imposed by statute may not be maintained as a class action."). In fact, the court noted the New York legislature amended § 901(b) to include the

31 - OPINION & ORDER

limitation on statutory damages in class actions in an effort "to avoid 'annihilating punishment of the defendant.'" *Id.*, at *4 (quoting *Shady Grove Orthopedic Assoc. v. Allstate Ins.*, 559 U.S. 393, 444 (2010)(dissent)). Thus, unlike Oregon, the New York legislature specifically weighed the public interest and the possibly punitive nature of aggregated statutory damages awards and decided in favor of limiting statutory damages in class actions. The *Montera* court noted that the New York legislature's "explicit concern about the punitive nature of aggregated statutory damages differentiates this case from others involving high awards of statutory damages." 2022 WL 3348573, at *5. The court strongly considered New York's stated preference to avoid statutory damages in its evaluation of the request for $91 million by plaintiffs. In addition, unlike § 652.150, GBL §§ 349 and 350 do not set out either a specific amount of damages for violations of those sections or a method required to calculate such damages. Accordingly, the New York legislature did not indicate what amount of damages or what calculation process was sufficient to compensate plaintiffs or to deter future conduct by defendants, but that was also unlikely to punish violators too harshly. This case, therefore, is not a strong comparator.

Defendant also points to *Golan v. FreeEats.com, Inc.*, 930 F.3d 950 (8th Cir. 2019), in which plaintiffs brought a class action for violations of the TCPA based on approximately 3.2 million robocalls made to class members in one week. The jury found in favor of the plaintiffs and, pursuant to the TCPA's statutory damages provision, awarded statutory damages of $500 per call for a total of $1,621,246,500. The defendant moved for a reduction of damages on the basis that the award was so excessive that it violated due process. The district court granted the motion and reduced the statutory damages award to $32,000,000 based on $10 per call. The Eighth Circuit affirmed noting "[t]o state the obvious, $1.6 billion is a shockingly

large amount." *Id.* at 962. The defendant "plausibly believed it was not violating the TCPA," the advertising campaign that generated the calls was "conducted for only about a week," and the "harm to the recipients was not severe - only about 7% of the calls made it to the" relevant question. *Id.* at 963. The Court finds this case is also a weak comparator because here there is no dispute that Defendant understood its obligation to withhold no more than 50% of the WBF assessment from employees' wages at the time that it over-withheld WBF funds; Defendant committed the violation for several years; and although the amounts of individual WBF over-withholdings were small, Oregon has expressed a strong public policy in favor of employees receiving all of their wages when they are due. In addition, $1.6 billion in statutory damages is over 305 times the award of penalty wages in this case and, therefore, is of limited assistance in evaluating the constitutionality of an award of just over $5.3 million.

   In summary, the parties do not point to any case that is extremely similar to this case, but the Court finds that the *Migis* decision slightly favors not reducing the penalty wage award.

  **C.**  **Conclusion**

   The *Williams* and *Six Mexican Workers* factors mainly favor not reducing the penalty wage award. The Court notes again that "Oregon has expressed in its wage-and-hour laws a strong public policy interest in the full and timely payment of employee wages generally and upon termination." *Schedler*, 2017 WL 3412205, at *3. "Oregon's wage and hour statutes were enacted to protect wage earners from employers who might use their positions of economic superiority to hinder the payment of such wages, [therefore,] those statutes represent sound public policy geared toward remediating inequities arising from that power disparity." 366 Or. at

132–33. The Oregon legislature balanced this strong public policy with the risk of excessive

penalty awards to employers by enacting § 652.150, which permits penalty wages, but caps them

at the employee's hourly rate times eight hours times not more than 30 days. The Oregon

legislature also provided other ways in which employers can limit penalty wages under

§ 652.150. This Court must be careful not to "overstep the role of the judiciary and usurp the

power of the legislature" and must "interpret statutes with awareness that [the Oregon

legislature] . . . enacted limits as to damages." *Wakefield,* 51 F.4th at 1124. As noted,

Defendant's violations occurred against every Oregon employee in every paycheck for years. In

addition, many of the employees impacted by Defendant's violations were minimum wage

workers. Finally, Oregon's need to secure uniform compliance with its wage-and-hour laws is

fundamental and important. The Court, therefore, finds based on the *Williams* and *Six Mexican*

*Workers* factors that this case does not present the "most egregious of circumstances" in which

the Court should "disregard the plain statutory language directing damages and allowing class

action and other aggregation" and concludes the penalty-wage award is not "so severe and

oppressive as to be wholly disproportioned to the offense or obviously unreasonable." *Williams,*

251 U.S. at 67. Accordingly, the Court concludes the penalty-wage award does not violate due

process.

> **D.        Discretion to Reduce Penalty Award**

>       Defendant asserts even if the Court concludes pursuant to *Williams* and *Six*

*Mexican Workers* that the penalty-wage award is constitutional the Court should exercise its

discretion to reduce the award. Oregon Revised Statute § 652.150, however, mandates that the

Court award penalty wages under the circumstances of this case. That statute also sets out the

required method of calculating penalty wages as well as specific limitations on such an award. There is no provision in § 652.150 that allows for the reduction of penalty wages outside of the limits provided in that statute. Under these circumstances, courts have made clear that damages "may only be reduced if the award would be unconstitutional." *Golan*, 930 F.3d at 962. As the court explained in *Golan* "nothing in the relevant provision of the TCPA itself . . . allows for the reduction of statutory damages. . . . A separate provision of the TCPA allows damages of "up to $500 . . ." per violation, illustrating . . . that Congress knows how to create flexibility in statutory damages, but did not do so here." *Id.* Accordingly, when, as here, the legislature has established a specific amount or method of calculating statutory penalties, the Court does not have discretion to reduce a penalty award unless the award is unconstitutional. The Court, therefore, concludes it does not have discretion to decrease the penalty-wage award because it has concluded the penalty-wage award is constitutional. In addition, even if the Court had discretion to reduce the award, it would decline to do so for the same reasons that it found the penalty-wage award does not violate due process. Accordingly, the Court denies Defendant's Motion to Reduce Damages Award.

## DEFENDANT'S MOTION TO LIMIT PREJUDGMENT INTEREST FOR DELAYS ATTRIBUTABLE TO PLAINTIFFS

Defendant requests the Court toll prejudgment interest for a total of three years and four months on the basis that Plaintiffs unreasonably delayed this action in two separate periods: (1) November 1, 2011, through June 10, 2014, and (2) from December 6, 2021, through October 17, 2022.

35 - OPINION & ORDER

# I.    Prejudgment Interest

It is undisputed that prejudgment interest in this case is governed by Oregon Revised Statute § 82.010(1)(a), which provides: "The rate of interest . . . is nine percent per annum and is payable on . . . [a]ll moneys after they become due." "[T]he general rule, reflected in ORS 82.010(1)(a), [is] that interest accrues on money only after it 'becomes due.' Once due, the debtor has the use of money to which the debtor is not entitled, while the delay in payment deprives the creditor of that use." *Strawn v. Farmers Ins. Co. of Or.*, 353 Or. 210, 241 (2013) (citation omitted).

"The allowance of prejudgment interest in an action is not a matter of judicial discretion, but is required by ORS 82.010(1)(a) on 'all moneys after they become due.'" *Highway Comm. v. DeLong Corp.,* 275 Or. 351, 357 n.2 (1976). The Oregon Court of Appeals explained the "uncompromising language" of Or. Rev. Stat. § 82.010(1)(a) "has long been subject to a judicial gloss" that indicates "a party can receive prejudgment interest only [1] when the exact pecuniary amount was either ascertained, or ascertainable by simple computation" and (2) "the time from which interest . . . must run . . . can be ascertained." *Wilson v. Smurfit Newsprint Corp.*, 197 Or. App. 648, 673 (2005)(quotations omitted)(emphasis removed).

# II.    Analysis

Defendant does not dispute that the exact amount of the damages in this matter are set by statute or that the date from which prejudgment begins to run is October 31, 2011, as decided by the jury and by the parties' stipulation. The sole limiting factors identified by the "judicial gloss" on Or. Rev. Stat. § 82.010, therefore, have been satisfied. Defendant also concedes no Oregon court has found that "the period of time during which [prejudgment interest] may be

36 - OPINION & ORDER

awarded is subject to judicial discretion based on unreasonable delays caused by a party to whom money is due." Def.'s Mot. at 5. Nevertheless, Defendant points to decisions by courts in other states and asks this Court to read into § 82.010 the authority to "toll" prejudgment interest.

When "'interpreting a state statute, a federal court applies the relevant state's rules of statutory construction.'" *LL Liquor, Inc. v. Montana*, 835 F. App'x 917, 920 (9th Cir. 2020) (quoting *In re W. States Wholesale Nat. Gas Antitrust Litig.*, 715 F.3d 716, 746 (9th Cir. 2013)). Accordingly, the Court applies Oregon's rules of statutory construction to interpret § 82.010.

Oregon Revised Statute § 174.010 provides:

> In the construction of a statute, the office of the judge is simply to ascertain and declare what is, in terms or in substance, contained therein, not to insert what has been omitted, or to omit what has been inserted; and where there are several provisions or particulars such construction is, if possible, to be adopted as will give effect to all.

When construing a statute, "a court shall pursue the intention of the legislature if possible." Or. Rev. Stat. § 174.020(1)(a). *See also State v. Gaines*, 346 Or. 160, 165 (2009)("ORS 174.020 codifies - as it has for many years - the cardinal rule of statutory construction that a court shall pursue the intention of the legislature if possible.")(quotation omitted).

The language of § 82.010 is clear and unambiguous: prejudgment interest at the rate set out in that statute is required to be paid on all funds after they are determined to have been owed to the creditor. The jury determined all funds for the WBF claims became due on October 31, 2011, and the parties determined by stipulation that all other funds became due that same day. The Court is not free to ignore the clear language of § 82.010 or to create exceptions to the rule set out clearly therein. The Court also finds that tolling prejudgment interest would not pursue the intent of the legislature to compensate creditors for the deprivation of the use of

money to which debtors were not entitled. Accordingly, the Court denies Defendant's Motion to Limit Prejudgment Interest.

## CONCLUSION

For these reasons, the Court GRANTS Defendant's Motion to Correct Verdict, ECF 394; DENIES Defendant's Motion to Reduce Unconstitutionally Excessive Damage Awards, ECF 397; and DENIES Defendant's Motion to Limit Prejudgment Interest for Delays Attributable to Plaintiffs, ECF 399.

IT IS SO ORDERED.

DATED:_____March 30, 2023_____

_Marco Hernandez_

MARCO A. HERNÁNDEZ
United States District Judge

38 - OPINION & ORDER